[Civ. Nos. 47922, 51438. First Dist., Div. Three. Apr. 1, 1982.]

In re the Marriage of NANCY E. and SULLIVAN S. MARSDEN.
NANCY E. MARSDEN, Respondent, v.
SULLIVAN S. MARSDEN, Appellant.

Counsel

Robert J. Smith for Appellant.

T. Patrick Hannon, N. Perry Moerdyke, Jr., and Moerdyke & Hannon for Respondent.

## Opinion

**BARRY-DEAL, J.**—In this opinion we will consider the issues raised in two appeals (1 Civ. No. 47922 and 1 Civ. No. 51438) which were consolidated by this court "for the purposes of oral argument and decision" by an order dated May 22, 1981. Both appeals involve the same proceeding commenced by respondent (wife) to dissolve her marriage to appellant (husband) in the Superior Court of Santa Clara County on July 17, 1978. At trial the issue of the dissolution of the marriage was bifurcated from the remaining issues presented in the proceeding. An interlocutory judgment of dissolution of marriage was entered on February 27, 1979. An interlocutory judgment pertaining to the disposition of the community property was entered on April 5, 1979. This latter interlocutory judgment provides in part: "The value, disposition and

division of husband's pensions/annuities with CREP (#P-38492) and TIAA (#A-115014) was [sic] previously bifurcated by stipulation of counsel. In the event the parties are unable to agree, the court specifically retains jurisdiction to determine the value, disposition, and division of these two pensions/annuities."

The appeal in 1 Civil No. 47922 is from the interlocutory judgment entered on April 5, 1979. In this appeal husband contends (1) the trial court incorrectly determined the community interest in the leasehold and house he acquired prior to the marriage on which payments were made after marriage from community funds; (2) the trial court incorrectly found that certain shares of stock were community property on the ground that these shares of stock were purchased with funds from accounts in which separate and community property or funds had been commingled; (3) the trial court incorrectly concluded that there had been no periods of legal separation from the date of marriage (Feb. 1, 1971) until July 10, 1978; and (4) attorney's fees were improperly awarded to wife.

An interlocutory judgment pertaining to husband's pensions and/or annuities was filed on April 8, 1980. The appeal in 1 Civil No. 51438 is from the interlocutory judgment filed on April 8, 1980. Husband also contends on his appeal in 1 Civil No. 51438 that the trial court incorrectly determined that there had been no periods of legal separation from the date of marriage until July 10, 1978. Husband further contends in this second appeal that the interlocutory judgment, filed on April 8, 1980, is ambiguous in that it fails to specify the date of separation as the appropriate valuation date for the retirement benefits.

The facts necessary to resolve each issue will be set out in the discussion of the issue.

## Legal Separation

Husband contends that there were two periods of legal separation between the parties prior to July 10, 1978. Husband alleges that the parties were separated between (1) April of 1975 and September of 1976; and (2) June of 1977 and July of 1978. The resolution of this issue is important to husband because Civil Code section 5118 provides

that the earnings and accumulations of a spouse while living "separate and apart from the other spouse, are the separate property of the spouse." We have chosen to consider this issue first as the resolution of the issue may affect the determination of the community interest in the leasehold and house as well as certain shares of stock (1 Civ. No. 47922) and the retirement benefits (1 Civ. No. 51438).

Husband states that the interlocutory judgment entered on April 5, 1979, "with respect to the allocation of real property values and stock can only be explained by a finding that the parties did not live separate and apart." The interlocutory judgment filed on April 8, 1980, provides in part: "The parties were married February 11, 1971 and separated July 10, 1978. During the period February 11, 1971 to July 10, 1978, the parties did not live separate and apart." Husband contends that the finding that parties did not live separate and apart "was erroneous in view of the overwhelming evidence of [wife's] intent to terminate the marriage to her husband during these periods of separation."

The parties were married on February 11, 1971. On April 12, 1975, wife moved out of the house on Lathrop Drive, Stanford, in which she had lived with husband and moved into an apartment on Kingsley Street in Palo Alto. On April 25, 1975, wife filed a petition for dissolution of marriage. The April 25, 1975, action was not dismissed by wife until after she filed the present action for dissolution in July of 1978.

Wife testified although she filed the petition for dissolution in April of 1975, she did not want a divorce. Wife stated she simply wanted to work out the parties' differences. Wife rented the apartment in Palo Alto because it was close to the house on Lathrop and she wanted to remain near her husband. The parties' sexual relationship continued after wife moved out of the house on Lathrop. The parties also saw a marriage counselor during this period.

Wife went to Puerto Vallarta, Mexico, in June of 1975. Husband went to Bogota, Colombia, in the summer of 1975 to "give some lectures." On his way to Bogota and on his return trip, husband spent a few days with wife in Puerto Vallarta. Husband testified that he and wife agreed that upon her return from Puerto Vallarta in August or September of 1975 they would dissolve the marriage.

Husband was invited to lecture in Iran and asked wife if she would like to accompany him. Husband and wife left for the Middle East in

September of 1975 and were gone for five or six weeks. Upon their return from the Middle East, wife continued to live in the apartment on Kingsley. In December of 1975 husband and wife went to Puerto Vallarta for Christmas.

Wife returned to Puerto Vallarta in June of 1976 and remained there for the summer. In September of 1976 husband met wife in Los Angeles and drove with her to the Palo Alto area. Shortly thereafter husband went on a three-week trip, and when he returned in the first week of October, "I found that completely to my surprise [wife] and her two daughters had moved back into the house."

Husband was on sabbatical leave from Stanford University from June of 1977 until July of 1978. Since husband planned to travel around the world during his leave, the parties decided to rent the house on Lathrop and that wife would live in Puerto Vallarta where husband would visit her. During this year, husband spent approximately 14 weeks in Puerto Vallarta. Husband testified that he did not believe he and wife were separated during his sabbatical because of any marriage problems. During this period he received warm and loving letters from wife. Husband subsequently learned that during this year, wife was writing letters to her mother indicating that there were problems with the marriage.[1] Wife also testified that during this year, she wrote to her mother and stated that she was considering terminating the marriage. However, wife testified that she was merely thinking about the possibility of ending the marriage, and "it depended on how he acted toward me." Wife returned from Mexico in July of 1978 and removed her belongings from the house on Lathrop.

▉ "What little law defines separation under Civil Code section 5118 holds that 'living separate and apart' refers to 'that condition when spouses have come to a parting of the ways with no present intention of resuming marital relations.' [Citation.] That husband and wife may live in separate residences is not determinative. [Citations.] The question is whether the parties' conduct evidences a complete and final break in the marital relationship." (*In re Marriage of Baragry* (1977) 73 Cal.App.3d 444, 448 [140 Cal.Rptr. 779].)

---

[1]Husband in his briefs in both appeals allegedly quotes from said letters. However, these letters were not introduced into evidence, and the quotes are taken from questions asked by his counsel at trial.

In *Baragry*, husband moved out of the family residence and took an apartment with his girl friend. Husband ate frequently at the family residence and took his family on trips. Husband went with wife to Sun Valley for a week without the children. Husband attended social functions with wife and sent gifts and cards to her on holidays. The parties continued to file joint income tax returns, and husband maintained his voting registration at the family residence. This arrangement continued for four years, although remaining nonsexual. (*Id.*, at p. 447.) .

The court in *Baragry* found that the parties' conduct did not demonstrate "a complete and final break in the marital relationship. Here the only evidence of such a break is the absence of an active sexual relationship between the parties and husband's cohabitation elsewhere with a girlfriend. In our view such evidence is not tantamount to legal separation." (*Id.*, at p. 448.)

The finding of the trial court that during "the period February 11, 1971 to July 10, 1978, the parties did not live separate and apart" is supported by substantial evidence. We will first consider the time period between April of 1975 and September of 1976. Admittedly wife moved out of the family residence in April of 1975 and filed a petition for dissolution. However, she took absolutely no further legal action for over three years. The parties continued their sexual relationship and attempted to resolve their marital differences with the aid of a marriage counselor. Husband joined wife in Mexico in the summer of 1975 and traveled with her to the Middle East in September and October of 1975. The parties spent Christmas together in 1975 in Mexico. They again traveled together in September of 1976. When husband returned from a trip in the first week of October of 1976, wife had moved back into the family residence.

We do not feel that such evidence establishes as a matter of law that the parties had come to a parting of the ways with no present intention of resuming marital relations. Rather, the parties' conduct would appear to be an attempt to affect a reconciliation on an international scale and certainly does not reflect a complete and final break in the marital relationship.

The only evidence that would support a finding that the parties were living separate and apart during the time period between June of 1977 and July of 1978 was the testimony regarding the letters wife wrote to her mother. However, wife testified she was merely considering the pos-

sibility of terminating the marriage during this period. The evidence clearly shows that the parties were living apart during this period because husband was on a sabbatical leave and was required to do a great deal of traveling. ■ "Living separate and apart ... does not apply to a case where a man and wife are residing temporarily in different places due to economic or social reasons, ..." (*Makeig* v. *United Security Bk. & T. Co.* (1931) 112 Cal.App. 138, 143 [296 P. 673].)

### Valuation of Leasehold and House

Husband concedes that there is a community interest in the leasehold and house. He contends, however, that the trial court incorrectly calculated the community interest. We agree.

The pertinent facts are as follows: in 1962, husband paid to Stanford University $6,300 for an 80-year lease of a parcel of property owned by Stanford. That same year, he had a house constructed on the property which he financed by a $2,000 cash payment and the proceeds from a $30,000 loan from Stanford. Thus, the cost of the property in 1962 was $38,300. By the time the parties were married in February 1971, husband had reduced the loan by $7,000, so the outstanding balance was $23,000. During the marriage, payments from community funds further reduced the principal due on the loan by $9,200. Between the time of separation in July 1978 and trial in February 1979, husband paid $655 on the principal.

■ The trial court found the fair market value (FMV) of the house and leasehold interest was $65,000 at the time of the marriage in February 1971 and $182,500 at the time of trial. It computed the appreciation as "$136,700 [*sic*; $126,700]", the difference between the equity at the time of trial ($182,500 less a loan balance of $13,800 equals $168,700) and the equity in 1971 ($65,000 less the $23,000 loan balance equals "$32,000 [*sic*; $42,000]"). It then allocated "$77,632 [*sic*; $71,953]" as the community interest based on the ratio of separate property loan payments ($7,000 or 43.21 percent) to the community property loan payments ($9,200 or 56.79 percent). This was clearly in error.

■ "Where community funds are used to make payments on property purchased by one of the spouses before marriage 'the rule developed through decisions in California gives to the community a pro tanto community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments

made with separate funds.' [Citations.]" (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 371-372 [168 Cal.Rptr. 662, 618 P.2d 208].) In clarifying the application of the rule, the Supreme Court has recently reaffirmed a formula articulated in *In re Marriage of Aufmuth* (1979) 89 Cal.App.3d 446, 454-457 [152 Cal.Rptr. 668], and approved in *In re Marriage of Lucas* (1980) 27 Cal.3d 808, 816-817 [166 Cal.Rptr. 853, 614 P.2d 285], to determine the respective community and separate interests in the property. (*In re Marriage of Moore, supra*, 28 Cal.3d 366, 373-374.) The formula gives recognition to the economic value of any loan proceeds contributed toward the purchase of the property. Where, as in *Moore* and in the case before us, the loan was extended before marriage and was based on separate assets, it is a separate property contribution. The *Moore* court also negated the inclusion of such expenses as loan interest and taxes in the computation, thereby clearing up any ambiguity created by the holding in *Vieux v. Vieux* (1926) 80 Cal.App. 222 [251 P. 640]. (*In re Marriage of Moore, supra*, 28 Cal.3d at p. 371.)

■ Under the *Moore/Lucas/Aufmuth* formula, husband's separate property percentage interest is determined by crediting the separate property with the down payments and the full amount of the loan, less the amount by which the community property payments reduced the principal balance of the loan ($8,300 plus ($30,000 less $9,200) equals $29,100). This sum is divided by the purchase price for the separate property percentage share ($29,100 divided by $38,300 equals 75.98 percent). The community property percentage interest is found by dividing the community property payments on the loan principal by the purchase price ($9,200 divided by $38,300 equals 24.02 percent).

Husband proposes a modification of the above formula. He contends, and we agree, that he should have the benefit of approximately nine years of appreciation in the value of the property before the marriage in 1971. Husband argues that his separate property percentage interest should be 85.85 percent, based on the FMV of the property at the time of marriage ($65,000), rather than the purchase price in 1962 ($38,300).

Husband does not cite any cases directly on point, and we can find none. The *Moore/Lucas/Aufmuth* formula makes no provision for prenuptial appreciation on property and therefore offers no guidance. In *Moore*, however, the court stated: "This rule [giving the community a pro tanto community property interest for community contributions to

separate property] has been commonly understood as excluding payments for interest and taxes. For example in *Bare* v. *Bare* [(1967) 256 Cal.App.2d 684, 690 (64 Cal.Rptr. 335)], the Court of Appeal directed the trial court to determine *the increase in equity in the house during marriage and the fair market value of it before and after the marriage*, stating: 'the community is entitled to a minimum interest in the property represented by the ratio of the community investment to the total separate and community investment in the property. In the event the fair market value has increased disproportionately to the increase in equity the wife is entitled to participate in that increment in a similar proportion.' [Citations.]" (*In re Marriage of Moore, supra*, 28 Cal.3d at p. 372, italics added.) The court further explained that "[a]mounts paid for interest, taxes and insurance do not contribute to the capital investment and are not considered part of it. A variety of expenses may be incurred in the maintenance of investment property, but such expenses are not considered in the valuation of the property except to the extent they may be relevant *in determining its market value from which in turn the owners' equity is derived by subtracting the outstanding obligation.*" (*Id.*, at p. 372, italics added.)

It is clear that part of our confusion results from the use of the word "equity." It is defined as "5. [t]he amount or value of a property or properties above the total of liens or charges." (Webster's New Internat. Dict. (2d ed. 1935) p. 865.) The fair market value at or near the time of purchase is usually equivalent to the purchase price. In short, the appraised value equals the cost value. Such was the case in *Moore*, where the respondent wife had purchased the property eight months before the marriage, and thus no question of the fair market value of the home at the time of marriage was posed. (*Id.*, 28 Cal.3d at p. 370.)

Where the separate property is owned for a considerable period before marriage, the increase in value in an inflationary market, such as we have had for the past several decades, is substantial. The fair market value at the time of marriage would usually be significantly greater than the purchase price, and this is true in the case before us. We think it is equitable to credit the separate property interest with this prenuptial appreciation. Although we are bound by the *Moore/Lucas/ Aufmuth* formula, and adjustments must fit within that formula,[2] we

---

[2]We note that the trial court is given greater flexibility in determining the community and separate interests in property where one spouse has contributed "industry" rather than community capital to separate property. (See *Beam* v. *Bank of America*

can infer from the language in *Moore* and *Bare* that recognition of prenuptial appreciation in the separate property estate is appropriate. As previously stated, the *Moore* court in explaining the pro tanto allocation rule noted the direction in *Bare* to the trial court "to determine the increase in equity in the house during marriage and the fair market value of it before and after the marriage ...." (*In re Marriage of Moore, supra*, 28 Cal.3d at p. 372.)

We therefore compute the pro tanto community and separate property interests in the house and leasehold interest as follows:

| | | |
|---|---:|---:|
| Purchase price in 1962 | $38,300.00 | |
| Less community payments | 9,200.00 | (24.02%) |
| Separate property interest | $29,100.00 | (75.98%) |

| | | |
|---|---:|---:|
| FMV at time of trial | | $182,500.00 |
| Less purchase price | $38,300.00 | |
| Appreciation before marriage | 26,700.00 | 65,000.00 |
| Appreciation during marriage | | $117,500.00 |

Separate property interest:

| | | |
|---|---:|---:|
| Down payments | $8,300.00 | |
| Loan payments | | |
|   Before marriage | 7,000.00 | |
|   After separation | 655.00 | |
| | | $15,955.00 |
| Appreciation before marriage | | 26,700.00 |
| 75.98% of appreciation after marriage | | 89,276.50 |
| | | $131,931.50 |

(1971) 6 Cal.3d 12, 18 [98 Cal.Rptr. 137, 490 P.2d 257].) For an analysis and criticism of *In re Marriage of Moore, supra*, 28 Cal.3d 366, see California Family Law Report (1980) 1458-1462.

Community property interest:

| | |
|---|---:|
| Loan payments | $ 9,200.00 |
| 24.02% of appreciation after<br>marriage | 28,223.50 |
| | 37,423.50 |
| Balance on loan at time of trial | 13,145.00 |
| | $182,500.00 |

Based upon the above computations, the trial court should have awarded husband a separate property interest of $131,931.50, plus one-half of the community interest, or $18,711.75, for a total of $150,643.25. The wife's one-half share of the community interest is $18,711.75, and husband, of course, is responsible for the balance due on the loan.

### Stocks

Husband contends that the trial court "incorrectly allocated the shares of stock owned by the husband at the termination of the marriage between separate and community property." Prior to marriage husband owned a substantial amount of shares of stock. During the marriage husband had a checking account at Union Bank in his name. Husband's pay check was automatically deposited into his account at Union Bank. Husband also had an account in his name at Great Western Savings and Loan. During the time the parties were married, husband sold some of the shares of stock he owned and purchased others. Husband admits that some of the proceeds from the sale of certain shares of stock were deposited in his account at Union Bank. Husband concedes "that the Union Bank account was commingled to the extent that proceeds from stock were sometimes deposited therein along with his salary checks, the salary checks being community property." However, husband states "there were numerous stock sales and purchases which never went into the Union Bank Account." Husband asserts that the "[p]roceeds from the sale of stocks, dividends and interest were deposited generally in the Great Western Savings and Loan account which he carried in his name and which he had owned prior to marriage" and the trial court incorrectly determined that the shares of stock that were purchased from funds from the Great Western Savings and Loan account were community property. Husband claims he adequately proved that certain shares of stock were purchased from funds in his Great Western Savings and Loan account or other separate property funds through the testimony of Kevin Loney, a certified public accountant. Husband states Loney "logged each stock transaction on a

multipaged worksheet showing each sale of stock owned prior to the marriage, the disposition of the proceeds of the sale, and the shares of stock purchased with the disposition of the proceeds of the sale. He traced each transaction by brokerage statement and amount into an account either with the Great Western Savings and Loan, Union Bank, California Federal Savings and Loan, or a stockbrokerage account.... Mr. Loney's worksheet showed exactly where the money came from, where it went and how it was disposed of." Accordingly, husband contends since he adequately demonstrated that certain shares of stock were purchased from his separate property account at Great Western, these shares of stock remained his separate property although purchased during marriage.

Husband made the same contention in the trial court. The trial court in its memorandum of decision gave the following explanation for its rejection of husband's contention: "Husband also argues that since the funds from the Great Western account were his separate property that stock purchased from his fund are still his separate property and that the only question of identity centers around stocks purchased from funds in the [Union] Bank. Husband's arguments along this line would be persuasive if the Court were satisfied as to the truth of husband's contentions, but it is not. The Court cannot find that husband has carried his burden of proof in establishing what stocks were purchased from funds in the Great Western account. Husband could have avoided this difficulty by some rudimentary record keeping, but he kept virtually no records in this respect and it is far too late to reconstruct them with any degree of persuasive proof."

■ "Property acquired by purchase during a marriage is presumed to be community property, and the burden is on the spouse asserting its separate character to overcome the presumption. [Citations.] The presumption applies when a husband purchases property during the marriage with funds from an undisclosed or disputed source, such as an account or fund in which he has commingled his separate funds with community funds." (*See* v. *See* (1966) 64 Cal.2d 778, 783 [51 Cal. Rptr. 888, 415 P.2d 776].) ■ "'The mere commingling of separate with community funds in a bank account does not destroy the character of the former if the amount thereof can be ascertained.' [Citations.] As the court in *Patterson* [*Patterson* v. *Patterson* (1966) 242 Cal.App.2d 333, 341 (51 Cal.Rptr. 339)] stated: 'If the property, or the source of funds with which it is acquired, can be traced, its separate property character remains unchanged. [Citations.] But if separate and commu-

nity property or funds are commingled in such a manner that it is impossible to trace the source of the property or funds, the whole will be treated as community property ...."'" (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 611 [122 Cal.Rptr. 79, 536 P.2d 479].)

■ The presumption that all property acquired by either spouse during the marriage is community property may be overcome. (*Id.*, at p. 611.) "Generally speaking there are two methods of carrying the burden of showing property purchased during the marriage to be separate: (1) direct tracing to a separate property source or (2) proof that at the time of purchase all community income was exhausted by family expenses." (*Estate of Murphy* (1976) 15 Cal.3d 907, 918 [126 Cal.Rptr. 820, 544 P.2d 956].)

The issue for this court to determine is whether husband, as a matter of law, introduced sufficient evidence to directly trace the source of the funds used to acquire each item of disputed property to his separate property in accordance with the standards set out by the courts of this state. "[T]he burden of establishing a spouse's separate interest in presumptive community property is not simply that of presenting proof at the time of litigation but also one of keeping adequate records. 'The husband may protect his separate property by not commingling community and separate assets and income. Once he commingles, he assumes the burden of keeping records adequate to establish the balance of community income and expenditures at the time an asset is acquired with commingled property.'" (*Estate of Murphy, supra*, 15 Cal.3d at p. 919.) "Evidence which merely establishes the availability of separate funds on particular dates without also showing any disposition of the funds is not sufficient proof of tracing to overcome the presumption in favor of community property." (*Id.*, at p. 918; see also *In re Marriage of Mix, supra*, 14 Cal.3d 604, 613-614.)

In *Mix*, wife "introduced into evidence a schedule compiled by herself and her accountant from her records which itemized chronologically each source of separate funds, each expenditure for separate property purposes, and the balance of separate property funds remaining after each such expenditure." (*Id.*, 14 Cal.3d at p. 613.) In *Mix*, wife conceded "that she was unable to support the schedule by correlating each itemized deposit and withdrawal on the schedule with an entry in a particular bank account due to the unavailability of various bank records as well as to the lack of such records of her own." (*Id.*, at p. 614.) The California Supreme Court in *Mix* held "that the schedule

by itself is wholly inadequate to meet the test prescribed by *Hicks* v. *Hicks* [1962] 211 Cal.App.2d 144, and to support the trial court's finding that [wife] 'identified and traced' the separate property. However, the schedule was not the only evidence introduced by [wife] to effect the tracing. She personally testified that the schedule was a true and accurate record, that it accurately reflected the receipts and expenditures as accomplished through various bank accounts, although she could not in all instances correlate the items of the schedule with a particular bank account, ..." (*Ibid.*) The California Supreme Court in *Mix* noted that the "trial court evidently believed" wife and was "warranted in inferring from this evidence that the bank records if introduced would fully verify the schedule as supported by [wife's] testimony to the effect that 'separate funds ... continue[d] to be on deposit when a withdrawal [was] made ... for the purpose of purchasing specific property, and ... [that] the intention of the drawer ... [was] to withdraw such funds therefrom ....'" (*Ibid.*)

█ There is substantial evidence in the instant case to support the trial court's finding that husband did not introduce sufficient evidence to trace directly the source of the funds used to acquire each item of disputed property to his separate property to overcome the presumption in favor of community property. Husband merely established that at most times under consideration he had sufficient separate funds available to make the purchases of the shares of stock in question. Husband has failed to show that he actually expended said funds for the purchases of the disputed shares of stock. Contrary to the assertion made by husband, the work sheet and testimony of Loney did not show "exactly where the money came from, where it went and how it was disposed of." In preparing the work sheet, Loney looked at husband's position at the end of the year. Loney looked to the stocks husband owned at the time of marriage, and then for each year the parties were married, calculated the difference between the amount of money needed to purchase the stock and the amount of money received from the sale of various stocks in a particular year. Loney assumed that the difference between these two figures was separate property of husband regardless of where the funds for the purchase were obtained or where the proceeds from the sale were deposited. For example, Loney stated that husband in 1973 purchased certain shares of stock for $11,991 and the funds to purchase the stocks came from Great Western and Union Bank. When husband sold stock the proceeds from the sale "would be spread among [husband's] accounts in some way." Loney admitted that if husband purchased stock from the account at Union Bank and then

sold this particular stock and placed the funds in his account at Great Western, his work sheet would not show that the funds originally were from the account at Union Bank. In other words, husband did not attempt to deposit the proceeds from the sale of stock into the same account from which the funds were obtained to purchase the stock. In 1975, the amount of money expended to purchase stock exceeded the amount of money received from the sale of stock or dividends in the amount of $1,334. In 1976, husband purchased stock in an amount which exceeded the proceeds realized from the sale of stock in that year in the amount of $1,500. These sums did not come from separate property funds.

The work sheet was inadequate by itself to overcome the presumption in favor of community property. Husband was unable to support the schedule by correlating each purchase and sale on the schedule with an entry in a particular bank account. Husband apparently concedes that the funds in the Union Bank and the stock purchased from this account are community property because the funds were so commingled that they could not be traced. Husband did not keep adequate records to establish which stocks were purchased from his account at Great Western. Loney looked at husband's position at the end of the year and was not always able to ascertain from which bank account husband obtained the funds to make his stock purchases or in which bank account he deposited the proceeds of a sale. Husband used some community property funds in his stock transactions, but the record does not establish in which transactions such funds were used. Husband indiscriminately deposited and withdrew funds from his bank accounts for his stock transactions. As noted above, Loney admitted that if husband purchased stock from the account at Union Bank and then sold this particular stock and placed the funds in his account at Great Western, his work sheet would not show that the funds originally were from the account at Union Bank. The proceeds from the sale of stock were not necessarily deposited in the account from which the funds were obtained to purchase that particular stock.

Since the records introduced by husband were prepared after the stock transactions took place and the work sheet did not correlate each stock transaction with an entry in a particular bank account and it is close to impossible to trace the source of most of the shares of stock because husband indiscriminately deposited and withdrew funds from his bank accounts for his stock transactions, the trial court did not err in determining that all of the stock purchased by husband during the mar-

riage was community property on the ground that it could not determine which stocks were purchased from funds in the Great Western account. This determination was a question of fact for the trial court and its finding on the issue is supported by substantial evidence. (*In re Marriage of Mix, supra*, 14 Cal.3d 604, 612.)

Husband also states that certain shares of stock were acquired prior to marriage and certain other shares of stock were inherited by him "and were not traded." Husband contends that these shares of stock were his separate property. In regard to this contention husband states: "the evidence is clear that of the shares he owned prior to marriage, he never dealt with the following: 200 shares of American Telephone and Telegraph, 125 shares of Northern Illinois Gas Company, now known as Nicor, 240 shares of J. P. Morgan, 225 shares of Suburban Propane, and 100 shares of Stanford Bank, now Union Bank Corp. In addition, he had a small amount of American Telephone which was converted by that company into preferred American Telephone and was never traded by him. 33 shares of Union Electric Corporation, 10 shares of First Union Bank Corporation, 370 shares of Dividend Shares, 37 shares of Anchor Income Fund, 35 shares of Wellington Fund and an $8,000 American Financial Debenture were inherited by him and were not traded. All of these shares should have been held to be separate property. The Trial Court, admittedly faced with a large stock portfolio, only found that the American Telephone and Telegraph, Morgan Guaranty Trust, Northern Illinois Gas Company and Suburban Propane Gas were the husband's separate property."

Husband testified at trial that four of the stocks he had at the time of trial, he had acquired prior to marriage and had not engaged in any transactions involving these stocks during the marriage. Husband testified that these four stocks were American Telephone and Telegraph, J. P. Morgan, Northern Illinois Gas (now known as Nicor) and Suburban Propane Gas. Husband also contends that he owned shares of Union Bank Corporation prior to marriage and purchased additional shares after marriage. Appellant asserts that the shares of Union Bank Corporation that he acquired prior to the marriage are his separate property. The trial court did not err in determining that the shares of Union Bank Corporation were community property. Husband did not produce any adequate documentation which showed the number of shares he acquired prior to the marriage. In regard to the shares of stock husband contends that he received from his parents during the

marriage, husband failed to introduce any evidence that in fact he received these stocks from his parents either as an inheritance or a gift.

Husband contends that a significant portion of the shares of stock that the trial court determined to be community property "was bought on a margin account on which, at the beginning of January, 1979, $38,220 was owed ...." In regard to the margin account, husband states the "trial court demonstrated its lack of knowledge of what constitutes a margin account because it did not take into allowance the brokerage firm's debit of $38,000 for the account. This corresponded to the market value of a substantial amount of the stock held at the time of the trial. Later on, these were sold to wipe out the margin account and to avoid the currently very high interest rates. That $38,000 actually should have been a debit to the appellant." Husband did testify that at the time of trial (Jan. 10, 1979) his "current" obligation of his margin account was about $38,000. However, husband failed to introduce any evidence that his obligation on the margin account at the time of trial was on account of any of the stocks that the trial court determined to be community property of the parties. Husband had the opportunity to produce evidence on this issue at trial, and since he failed to produce evidence regarding the transactions that resulted in a $38,000 obligation on his margin account, he cannot now contend that the trial court should have considered the amount owing on his margin account in dividing the shares of stock.

### Attorney's Fees

We now turn to husband's argument that attorney's fees were improperly awarded to wife. Husband does not challenge the jurisdiction of the court in a dissolution proceeding to award attorney's fees. (See Civ. Code, § 4370; *In re Marriage of Holmgren* (1976) 60 Cal.App.3d 869, 873 [130 Cal.Rptr. 440].) But he does claim that the award of $2,500 for attorney's fees to wife was excessive. He further argues that there is no evidence in the record that wife was in need of attorney's fees given the fact that wife was awarded "community property assets in the approximate amount of $200,000." Husband in making this latter argument states that there is evidence in the record that wife had sufficient funds with which to engage an attorney separate and apart from her share of the community property assets.

Civil Code section 4370, subdivision (a), authorizes the court in a dissolution proceeding to order the husband or wife "to pay such

amount as may be reasonably necessary for the cost of maintaining or defending the proceeding and for attorneys' fees; . . ." ▮ The need of a spouse for an award of attorney's fees and the amount of that award are matters addressed to the sound discretion of the trial court. (6 Witkin, Summary of Cal. Law (8th ed. 1974) Husband and Wife, § 146, pp. 5013-5014.) The exercise of this discretion will not be disturbed on appeal "without a clear showing of abuse." (*In re Marriage of Holmgren, supra*, 60 Cal.App.3d at p. 873.)

The fact that wife was awarded a substantial amount of community property assets in the instant case does not require a finding that the trial court abused its discretion in awarding her attorney's fees. A similar contention was considered in *In re Marriage of Borson* (1974) 37 Cal.App.3d 632, 639 [112 Cal.Rptr. 432], and rejected. (See 6 Witkin, Summary of Cal. Law (8th ed. 1974) Husband and Wife, § 141, pp. 5008-5009.)

Nor does it appear that the award of attorney's fees in the instant case was excessive. "'The question of the reasonableness of the order for attorney's fees is addressed to the sound discretion of the trial court [citations], and in the absence of a clear showing of abuse its determination will not be disturbed on appeal.'" (*In re Marriage of Lopez* (1974) 38 Cal.App.3d 93, 113 [113 Cal.Rptr. 58].)

### Valuation Date for the Retirement Benefits

Husband contends that the date of separation rather than the date of trial is the appropriate valuation date for his retirement benefits. Husband reasons "[w]hile there is case law and code authority [Civil Code § 4800(a)] indicating that the assets shall be valued as nearly as practical to the time of trial, in the case of retirement assets which continued to increase in value because of the employment of the spouse during the period of separation, utilizing the date of trial as the valuation date would give an inaccurate allocation."

The interlocutory judgment filed on April 8, 1980, provides in part: "[Husband's] TIAA/CREF pensions/annuities are to be divided in accordance with the court's prior interlocutory decree dividing the parties' community property. All contributions during the marriage and the accumulations thereon are the community property of both parties and are to be divided equally between the parties." Husband states "the

judgment does not specify the date on which the retirement benefits are to be valued. To that extent the judgment is uncertain and ambiguous."

■ Contrary to husband's contention retirement benefits are not valued at the time of separation. The California Supreme Court has indicated that there are two basic solutions to the problem of the proper method for the division of pension or retirement benefits: "first, a determination by the trial court of the *present* value of the rights or benefits adjudged to be marital property and an equal division or adjustment of the same [citations]; and second, 'if the court concludes that because of uncertainties affecting the vesting or maturation of [such] rights ... it should not attempt to divide the *present* value ... it can instead award each spouse an appropriate portion of each ... payment as it is paid.'" (*In re Marriage of Skaden* (1977) 19 Cal.3d 679, 688 [139 Cal.Rptr. 615, 566 P.2d 249], italics added.) If the nonemployee spouse chooses to wait to receive the retirement benefits until the employee spouse actually retires, the "nonemployee may thereby ensure some protection for the future and may be able to share in the increased value of the pension plan." (*In re Marriage of Gillmore* (1981) 29 Cal.3d 418, 428 [174 Cal.Rptr. 493, 629 P.2d 1].) Accordingly, the appropriate date of valuation of retirement or pension benefits is the date of trial or the date of payment of benefits. (*Id.*, at pp. 428-429; *In re Marriage of Skaden, supra*, 19 Cal.3d at pp. 687-689.) The date of valuation of retirement or pension benefits depends on when the community interest in such benefits is divided. The community interest in retirement benefits is that portion of the retirement benefits or pension attributable to employment from the date of marriage until separation. (See *id.*, at p. 688.)

The judgment in 1 Civil No. 47922 is reversed insofar as it determines the respective interest of the parties in the house and leasehold and divides the community property. The judgment in 1 Civil No. 51438 is affirmed. Each party shall pay his or her own attorney's fees and costs on appeal.

White, P. J., and Feinberg, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 27, 1982. Mosk, J., was of the opinion that the petition should be granted.