Filed 10/1/25  Marriage of Stein CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Marriage of SARA STEIN and JAY STEIN. | B339137 <br><br> (Los Angeles County Super. Ct. No. 19STFL12926) |
| SARA STEIN, <br><br> Respondent, <br><br> v. <br><br> JAY STEIN, <br><br> Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark A. Juhas, Judge.  Reversed and remanded in part with instructions, affirmed in all other respects.

Law Office of Joel S. Seidel and Joel S. Seidel for Appellant.

Skarin Law Group, Matthew K. Skarin and Maya Galicia-Canto for Respondent.

In this dissolution case, appellant Jay Stein contends the court miscalculated the community interest in the marital home, which respondent Sara Stein brought into the marriage as her separate property. Jay[1] argues that the court used an improper valuation date for the home, incorrectly accounted for community contributions to home equity, and improperly ordered him to pay *Watts*[2] charges for his exclusive post-separation use of the home (1) in excess of the community's interest and (2) directly to Sara. Sara responds that the trial court correctly imposed the *Watts* charges but made several errors in calculating the community interest in the home despite largely adopting the calculations of her expert. We reverse in part and remand for recalculation of the *Watts* charges, but otherwise affirm.

## BACKGROUND

Jay and Sara married on July 3, 2006 and separated on October 19, 2019. Sara entered the marriage with a Los Angeles home she acquired in 1998 as her separate property. According to Sara's expert, the home had a value of $1,075,000 at the time of acquisition,[3] and was encumbered by a mortgage of

---

[1] As is customary in family law cases, and in accordance with the parties' briefing here, we refer to the parties by their first names to avoid confusion. (See *In re Marriage of Lietz* (2024) 99 Cal.App.5th 667, fn. 1.)

[2] *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 (*Watts*).

[3] Jay asserts, and the limited appellate record confirms, that "[t]his is not a disputed figure." However, both parties now assert, without citation to any authority, that the acquisition value should be revised upward to $1,158,499 to reflect $83,499 worth of improvements Sara made to the property after its

approximately $676,000.  The parties stipulated that the home was worth $2,350,000 on the date of marriage.

## I.    Trial and Tentative Ruling

Both parties were represented by counsel during the November 2023 trial in this matter, which lasted five days and was not reported.  At trial, both parties introduced expert appraisal reports valuing the house at the time of separation.  The reports, which were prepared in 2023 shortly before trial, valued the house at $3,850,000 (Jay) and $3,100,000 (Sara) as of October 2019.

In the November 20, 2023 minute order documenting the last day of trial, the court stated that "all issues relating to the family residence will be deemed submitted once the value of the family residence is determined."  On November 27, 2023, the court issued a minute order "on its own motion, vacat[ing] the order taking the issue of the residence under submission."  In that same order, the court set the matter for a status conference "regarding the sale of the residence."

On December 15, 2023, the court issued a tentative statement of decision that "will be the statement of decision unless within 10 days either party specifies controverted issues or makes proposals not covered in the tentative decision."  The court noted that the status conference was "advanced and taken off calendar as it is no longer necessary."

In the tentative, the trial court found that Sara's expert was "more credible considering the evidence presented." The court accordingly adopted his date of separation value of $3,100,000, and current value of "reserved."  The court

---

acquisition but prior to marriage.  We decline to make this adjustment.

3

additionally noted its "belie[f]" that Sara was "contemplating selling" the home, and its awareness "that the parties made certain stipulations regarding the house contemplating a sale."

The court also made tentative findings and calculations regarding the interest the community acquired in the home via reduction of the principal balance on the home's mortgage, pursuant to *In re Marriage of Moore* (1980) 28 Cal.3d 366 (*Moore*) and *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426 (*Marsden*). Citing *In re Marriage of Ramsey and Holmes* (2021) 67 Cal.App.5th 1043 (*Ramsey*), the court first found that it had "sufficient information from the trial to make the rulings herein." The court then stated it was adopting the *Moore/Marsden* analysis of Sara's expert, who calculated the community interest at approximately 63 percent. The court nevertheless ordered the parties "to meet and confer to determine the community's percentage interest in the property at the time of separation."

Additionally, the court found that the "equities here dictate" imposition of *Watts* charges against Jay, because "after separation Respondent [Jay] resided in the Petitioner's [Sara] separate property home, paid a well below market rent (only when the court forced him to) all while Respondent received support from Petitioner." Based on testimony from Jay's expert, the court found that the total rental value of the home during Jay's exclusive possession was $258,000, and that Jay was entitled to credit for $52,500 he had already paid to Sara pursuant to an earlier order.

## II. Objections and Supplemental Ruling

Jay timely filed objections to the court's tentative ruling. He disputed the court's conclusion that he owed rent to Sara because she kept items in the home and entered the home from

time to time, rendering his use non-exclusive.  Jay further objected that "Watts charges are orders for reimbursements to the community for exclusive use of the property after separation.  Watts charges are not an assessment of a spouse for post-separation use of the other spouse's separate property."  Jay attached a declaration dated December 20, 2023 from an expert who determined that the court previously miscalculated the fair market rent on the home, which he opined totaled $365,400 during the relevant period, less credit to Jay for rent he had already paid.  The expert further concluded that, because by some measures the community's debt exceeded its contributions, the proper amount of *Watts* charges was zero.  Alternatively, he determined that the "net result is $447,300 . . . from JAY to SARA."

Jay objected to the tentative *Moore/Marsden* calculation as simply "incorrect."  His expert prepared an alternative calculation, concluding that the community fully paid the principal on the home's original $675,901 mortgage during the marriage.  The expert further asserted that "[b]oth forensic accounts [*sic*] agreed that the total cost of improvements" the community made to the home during the marriage was $928,350.  Adding the $675,901 and $928,350 together, the expert concluded the community contributed $1,604,251 to the equity in the home.  He then concluded that the home had $1,404,433 of encumbrances "at the date of separation," including a refinanced mortgage and a $450,000 loan, and that subtracting those encumbrances from the $3,100,000 value at the date of separation resulted in a total equity of $1,695,567.  The expert determined that the community's contribution comprised 95 percent of that equity, and therefore the community held a 95

5

percent share in the property. Using those figures to perform more calculations, he ultimately concluded that the "net result is $614,447 to JAY which could be paid from escrow at the sale of the property." Notably, Jay did not object to the court's use of the separation date value of the home, which his expert used in all his calculations.

In her response to Jay's objections, Sara agreed with Jay's expert that Jay should be assessed $447,300 in *Watts* charges. Through her own expert, she disputed his conclusion that the improvements to the home totaled $928,350; she asserted their value was well below that. "With respect to all other issues [Jay] raised related to *Moore-Marsden* and *Watts* charges, [Sara] assert[ed] that the Court was correct in its Tentative Decision and request[ed] that the Court affirm the Tentative Decision." Like Jay, Sara raised no objection to the court's use of the separation date value. In his reply, to which he attached another expert declaration, Jay reiterated his objections to the *Watts* and *Moore/Marsden* calculations.

After considering the parties' submissions, on January 8, 2024 the court issued a minute order containing what it said was its "final ruling" affirming the tentative with limited changes. Regarding the *Watts* charges, the court concluded the total rental value for the home during Jay's exclusive possession was $385,000. It continued: "Mohler[4] instructs that the court is to determine the overall profit from rental that 'would have obtained' during the Respondent's occupancy of the property. The case at bar is significantly different from Mohler. In Mohler, unlike the instant case, the owner of the separate property

---

4        *In re Marriage of Mohler* (2020) 47 Cal.App.5th 788 (*Mohler*).

6

resided in his separate property house.  Here, Respondent continued to reside in Petitioner's separate property.  The evidence is that the Petitioner, not the Respondent, paid the mortgage, insurance and other carrying costs of the house even though she did not reside in the house—all while paying the Respondent support.  Thus, the Petitioner was unable to live in the home she owned, causing her to incur unnecessary living expenses, while she paid all or most of the costs for Respondent's housing.  [¶] Respondent owes the Petitioner Watts charges in the amount of $385,000.  This figure is not affected in any way by the Moore/Marsden calculation below."

The court also addressed several aspects of the *Moore/Marsden* calculation, noting that it had reviewed "the lengthy and detailed pleadings and exhibits from both forensic experts."  Regarding improvements, the court first observed that "[t]his matter is complicated by the fact that during marriage the community borrowed money and used it for the specific purpose of improving the Petitioner's separate property house.  This debt was, and remains community debt. . . . Generally, the community will be reimbursed the greater of the cost of the improvements or the increase in the property value."  The court continued, "It is important to highlight what the court does not know.  Neither party attempted to quantify the increase in the property's value because of the improvements.  The parties knowingly and intentionally took on community debt to perform the remodeling; some of which was repaid and some of which still exists on the property.  The court has no evidence of the value of improvement to the property.  It appears that the various improvement projects did not go as planned, some had to be redone, some lawsuits resulted, and some work remains to be done.  As a

7

result, the court cannot determine what the actual increase in value for the property is. As a result, the court simply uses the amount of dollars spent. The evidence supports, and the court finds, that the amount of improvements is . . . $928,350. The Petitioner owes the community this amount from the sale of the house."

As to the community interest in the home, the court clarified that the "community property percentage is determined by dividing the community payments on loans by the purchase price. Here, the purchase price is $1,075,000. During marriage, the community paid down the various loans in the amount of $676,000. Some of this debt was paid by acquiring community debt, some was actually paid off. This results in a community interest of 63%. The equity increased $750,000 during marriage, so the community interest in the increase is $472,500." As to the allocation of community debt, the court concluded that debt incurred prior to separation was community debt for which the community needed to be reimbursed. The court ruled that Sara was "entitled to a dollar-for-dollar credit on the paydown of the community property debt" she paid after separation. "If she retains the house, the debt will follow the asset and the community is obligated to retire the debt."

## III. Rent Hearing and Additional Ruling

On January 9, 2024, the court on its own motion set the matter for a hearing on the issue of "Respondent owing rent to the Petitioner for her separate property interest" in the home.

The only record of that ensuing January 26 hearing in the appellate record is a minute order stating that the "Court and counsel confer extensively" and "[t]he matter is taken under

8

submission on this date." It is unclear if the parties filed briefs or other materials in connection with the hearing.

On January 30, 2024, the court issued another minute order putatively containing "the court's final ruling in this matter." It stated, "Respondent argues that as part of the Moore/Marsden analysis, the community is to be repaid the sum of $676,000 because the community paid that debt during marriage. Respondent is correct; however, that amount was already accounted for in the $928,350 figure in improvements. Both accountants agreed that as part of the refinance during marriage, some of the money retired debt and some of the money was used for improvements. Accounting for it again would cause a windfall to the community. So, while it may have been in the wrong 'column,' the community was appropriately compensated." The court continued, "In all other respects, the court's statement remains unchanged. By way of clarification, the court notes the following: [¶] 1.The [ ] house is awarded to the Petitioner; [¶] 2. Respondent owes the Petitioner $385,000 for 'Watts' charges; [¶] 3. Petitioner owes the community $928,350; [¶] 4. Petitioner owes the community $472,500; [¶] 5. To the extent Petitioner paid off community debt post separation, she will receive a dollar-for-dollar reimbursement from the community; and [¶] 6. To the extent there is any other community debt that follows the house, the community is obligated to reimburse her." The court directed Sara to prepare a final judgment and circulate it to Jay for approval and signature.

## IV.  Motion to Reopen Evidence

On February 20, 2024, three months after the conclusion of trial, Jay filed a motion to reopen evidence. In an accompanying declaration, Jay's counsel asserted that the house had recently

sold for $3,472,500.  Counsel stated that this represented "a substantial change in the value" of the property, such that the *Moore/Marsden* and *Mohler* "calculation[s] relating to the interest in the 63% community interest in the . . . property must be recalculated."

Sara and her counsel filed responsive declarations opposing the motion.  Sara stated that it was her "understanding that the sales price has no bearing on the Court's calculation of the community's interest in the property," and that "my counsel has made this clear to opposing counsel."  Sara's counsel similarly asserted that "the change in sales price has <u>no effect</u> on the calculation of the community's interest," because the court "relied on the value of the property on the day Petitioner acquired the property and on the date of separation."

In a reply declaration, Jay asserted that the home "was listed for sale while the evidence was being presented at trial and it was being actively marketed for private sale.  That private sale having not yet been consummated by the time of trial, and, therefore, no direct evidence of the property's value being before the Court, the Court imputed a value of the property from the Petitioner's appraiser.  However, subsequent to the close of evidence but prior to entry of judgment, an offer for purchase of the house was accepted and the property has closed escrow, yielding actual cash value of $372,000 more than the Court had imputed in the absence of such evidence."  Jay further asserted that his request to reopen was intended to "establish the most accurate evidence of the value of the . . . property at the time of trial," which "to my understanding, would be required" under *Moore/Marsden*.  He asked the court to "appreciate that it is appropriate and reasonable to deem an accepted offer on the

10

property approximately 60 days following the trial sufficiently proximate to trial to be the most accurate evidence of the actual value of the property at the time of trial."

In an accompanying memorandum of points and authorities, Jay argued that the community's 63 percent interest "should have been applied to the purchase price which was $3,472,000 and not the $3,100,000" value at the time of separation. He asserted that *Mohler*, *supra*, 47 Cal.App.5th 788, required the court to use the value of the property "as of the date of trial" when calculating the community interest. Jay further argued "that is the same interest that should be applied" to the *Watts* charges, "as opposed to 100% of the rental values assessed by the Court." "As an example," he asserted, "if the rental value was $10,000 a month, the community portion of that would have been $6,300 a month against which the Watts charges would have been applied or a total of $3,150 a month levied against the Respondent."

The trial court denied the motion to reopen in a minute order filed concurrently with the final judgment on March 29, 2024. It explained that "[a]ny increase in value, after the date of separation is entirely the Petitioner's. The important number for purposes of this matter is the date of separation value, which the court determined was $3.1 million. As Petitioner argues, the actual sales price is irrelevant to the inquiry at bar. Because the house is Petitioner's separate property it is irrelevant what the house sold for well after the date of separation."

## V. Judgment

In the final judgment, the court reiterated its previous findings regarding the home's separate property character, valuation, and community interest. It further found that the

11

home was encumbered by $1,404,373 on the date of separation, and that "[a]fter taking into account the reimbursements owed by Petitioner to the community and the reimbursements owed by the community to Petitioner, Petitioner is owed $3,453. As such, Respondent owes Petitioner a net equalization payment of $1,726.50."  The court added that "[i]n the event that Petitioner sells the [home], Petitioner is responsible for all costs of sale and tax consequences."  The court did not alter its previous ruling that Jay owed Sara $385,000 in *Watts* charges.

## DISCUSSION

Jay contends the trial court "made various errors by (1) using the wrong date of valuation, (2) failing to reimburse the community for principal reduction during the marriage, and (3) overcharging appellant for his use of the family residence post-separation."  Sara, who did not file a cross-appeal, also contends the trial court made various errors in its *Moore/Marsden* calculations.

## I.    Standards of Review

"'The trial court's findings on the characterization and valuation of assets in a dissolution proceeding are factual determinations which are reviewed for substantial evidence. [Citation.]'" (*In re Marriage of Wozniak* (2020) 59 Cal.App.5th 120, 130.)  "'"[T]he [trial] court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division.  [Citations.]"'" (*Ibid.*)  "However, when the resolution of the issue "requires a critical consideration, in a factual context, of legal principles and their underlying values,'" the issue is a mixed question of law and fact in which legal issues predominate, and de novo review applies.'"

12

(*Ibid.*) We review the court's equitable decision to impose *Watts* charges, and the amount thereof, for abuse of discretion. (*Mohler*, *supra*, 47 Cal.App.5th at p. 797.) A court abuses its discretion if it "exceeded the bounds of reason, all of the circumstances before it being considered." (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.)

"On appeal, we presume the judgment is correct. "'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown'" by the appellant." (*In re Marriage of Cipari* (2019) 32 Cal.App.5th 83, 93-94.) "Even if the trial court articulates the wrong reasons when arriving at a correct conclusion, we will presume the judgment correct and affirm it on any ground supported by the evidence, whether articulated by the trial court or not." (*In re Marriage of Brooks* (2019) 33 Cal.App.5th 576, 593.) Where, as here, the appellate record does not contain a reporter's transcript, "it is presumed that the unreported trial testimony would demonstrate the absence of error." (*In re Estate of Fain* (1999) 75 Cal.App.4th 973, 992.) "The effect of this rule is that an appellant who attacks a judgment but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence." (*Ibid.*)

## II. *Moore/Marsden*

### A. **Legal Principles**

"Under California's community property laws, property that a spouse acquires before the marriage, or during the marriage by way of gift or inheritance, is that spouse's separate property." (*Mohler, supra*, 47 Cal.App.5th at p. 791.) Other property acquired during the marriage, "due to the time, labor, or

skill of a spouse is community property in which the spouses have an equal interest." (*Ibid.*) "Upon dissolution, community property is divided equally between spouses, and separate property is awarded to only the owner." (*Ibid.*)

"When one spouse enters the marriage owning the home in which the spouses are to live, it is not self-evident how to characterize the appreciation on that separate property during the marriage, when, as is common, the marital community uses its funds to pay the loan on that separate asset." (*Mohler*, *supra*, 47 Cal.App.5th at p. 791.) In *Moore*, *supra*, 28 Cal.3d at pp. 371-372, the Supreme Court held that "as the community makes payments during the marriage that reduce the principal owned on the separate property, the community acquires a beneficial interest in that property, even if the title remains in the name of the original owner." (*Mohler*, *supra*, 47 Cal.App.5th at p. 792.) *Marsden*, *supra*, 130 Cal.App.3d 426 "supplemented *Moore*'s calculation by establishing that the owner of the separate property should be awarded the premarriage appreciation in the property's value." (*Mohler*, *supra*, 47 Cal.App.5th at pp. 792-793.) The community also gains an interest in the property "when the spouses refinance a separate property and pay off the original mortgage with a new loan" (*id.* at p. 793, citing *In re Marriage of Branco* (1996) 47 Cal.App.4th 1621, 1629), and when community funds are used to improve the separate property. (*Ibid.*, citing *In re Marriage of Allen* (2002) 96 Cal.App.4th 497, 501.)

*Ramsey*, *supra*, 67 Cal.App.5th at p. 1046 distilled these principles into a five-step formula:

"(1) Determine the amount by which the community property payments (typically, payments made from the date of

14

marriage until the date of separation) reduced the principal on the mortgage.

"(2) Calculate the community property percentage share by dividing the amount determined in step one by the purchase price.

"(3) Determine the appreciation in the value of the house during the marriage (i.e., from the date of marriage until the date of dissolution).

"(4) Multiply the appreciation during the marriage (the amount determined in step three) by the community property percentage share (the percentage determined in step two) to determine the community property share in the appreciation of the property.

"(5) Add the community property share in the appreciation of the property (the amount determined in step four) to the amount of community funds used to pay down the principal on the mortgage (the amount determined in step one) to determine the total community interest in the property at the time of dissolution."

B.     Analysis

1.     Community Contributions

Jay first contends that the trial court erred at step one of the *Moore/Marsden* calculation by failing to appropriately credit the community for $675,901 (which the court rounded to $676,000) it paid toward the original mortgage on the home.  In response, Sara contends that the court did credit the community for the $676,000 and erred because this was an overstatement of the community's contribution, which she asserts totaled only $530,334.  We find no reversible error.

15

First, we find Sara's challenges to the court's calculations, at this step and others, poorly taken. The court expressly relied on the *Moore/Marsden* calculation prepared by her expert, which included approximately $676,000 in its calculation of the community's contribution.  Sara also filed no objections to the court's tentative ruling, and in response to Jay's objections argued that "the Court was correct in its Tentative Decision and request[ed] that the Court affirm the Tentative Decision."  There is also no indication in the record that she disputed or disagreed with the findings the court made after the additional hearing, which included that the community paid a $676,000 debt during the marriage.  We accordingly conclude Sara either invited any error or forfeited any objection to the court's conclusion that the community contributed $676,000 to the mortgage principal.  (See *In re Marriage of Ilas* (1993) 12 Cal.App.4th 1630, 1640.)

We further conclude Jay has not shown error on this record.  To the extent he challenges the court's factual findings, he has not shown they were unsupported by substantial evidence. The court had broad discretion "to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division." (*In re Marriage of Wozniak*, *supra*, 59 Cal.App.5th at p. 130.)  The court considered the $676,000 contribution the community made toward the mortgage debt.  It found that some of the money used to pay that mortgage debt came from refinancing done to make improvements to the property.  In other words, the community refinanced the prior mortgage, paying it down, to borrow even more money to improve the property at a cost of $928,350. Because Sara had to reimburse the community for the full $928,350, the court found that "[a]ccounting for it

16

again would cause a windfall to the community." Jay has not shown that this conclusion was an abuse of the trial court's discretion.

## 2. Valuation Date

Next, Jay contends that the trial court erred at step three of the *Moore/Marsden* calculation by using the value of the house at the date of separation rather than the date of dissolution, i.e., the time of trial.[5] He asserts that the house appreciated by $372,000 during the four-year period between the date of separation and trial, and the community is legally entitled to an interest in that gain. Jay relies on *In re Marriage of Sherman* (2005) 133 Cal.App.4th 795, 800, which held that "the proper valuation date for community property residence for purposes of a dissolution proceeding is the date of trial unless there is some reason which renders this result inequitable." He also points to *Ramsey, supra,* 67 Cal.App.5th at pp. 1046-1047, which states that the trial court "must have…the market value of the house at dissolution" to perform the calculation correctly; has an "obligation to determine the value of the community property interest in the house"; and should have required the parties, who share an equal obligation to provide information, to provide additional evidence it needed to make that determination. (*Id.* at p. 1052.)

---

[5] As noted above in footnote 3, *ante*, both Jay and Sara also suggest that the court should have used a different, higher value for the purchase price in step two. Neither cites any authority for this proposition or makes legal argument in support of this this proposition, however, so we treat it as forfeited. (See *In re Marriage of Carlisle* (2021) 60 Cal.App.5th 244, 255.)

17

Sara responds that Jay forfeited this argument by failing to produce an appellate record showing that he "submitted his own *Moore/Marsden* calculation or made arguments regarding Petitioner's *Moore/Marsden* calculation at trial," "argued that the court should follow *Sherman* and *Ramsey* and use the date of trial valuation," or "argued that the trial court did not have sufficient information to perform a *Moore/Marsden* calculation." In reply, Jay asserts that he preserved the issue by objecting to the court's initial tentative *Moore/Marsden* analysis and including his expert's calculations, and by seeking to reopen evidence before judgment was entered. He also points to the post-trial minute orders submitting then vacating submission of "all issues relating to the family residence," characterizing them as "an implicit acknowledgement that the Court needed to obtain a current value" for the home. Alternatively, Jay contends that the issue is a pure question of law resting on undisputed facts and accordingly may be raised for the first time on appeal. We conclude that the argument is forfeited or, alternatively, that any error was invited.

We reject the contention that the valuation of the home presents a pure question of law on undisputed facts. Even if we assume the question of which date to use is one of law (see *Ramsey*, *supra*, 67 Cal.App.5th at pp. 1046-1047; Family Code, § 2552, subd. (a) ["For the purpose of division of the community estate upon dissolution of marriage . . . the court shall value the assets and liabilities as near as practicable to the time of trial"]), the limited appellate record reflects that the value of the home was disputed. The record also does not indicate whether the statutory criteria permitting the court to value the home "at a date after separation and before trial to accomplish an equal

18

division of the community estate in an equitable manner" were satisfied. (Fam. Code, § 2552, subd. (b).) Likewise, *In re Marriage of Sherman*, *supra*, 133 Cal.App.4th at p. 800, recognizes that equitable considerations may warrant use of a valuation date other than the date of dissolution. The record is silent as to whether such equitable considerations were in play here. We indulge all intendments and presumptions in favor of the judgment "on matters as to which the record is silent." (*In re Marriage of Cipari*, *supra*, 32 Cal.App.5th at p. 93.) Accordingly, we neither conclude the court misapplied the law nor impute subtext into the court's minute orders.

Furthermore, the record reflects that both parties, who were represented by counsel, commissioned expert reports valuing the home at the date of separation. Despite multiple suggestions in the record that imminent sale of the home was contemplated or already in process, and a specific Evidence Code provision allowing "[t]he owner or the spouse of the owner of the property" to opine on a home's value (Evid. Code, § 813, subd. (a)(2)), there is no indication in the appellate record that either party made any effort to introduce evidence of the home's contemporaneous value. On the limited record before us, it thus appears that both parties invited the court's error by representing that the relevant, disputed value of the home was the value on the separation date. A party who invites error may not profit from it. (*In re Marriage of Ilas*, *supra*, 12 Cal.App.4th at p. 1640.)

Finally, we reject Jay's suggestion that he properly and timely objected to the court's valuation date below. Although he is correct that he objected to the court's tentative ruling, none of his objections concerned the valuation date. The expert analysis

19

he provided at that time also used the date of separation as the sole relevant valuation date. After the court made its January 8, 2024 ruling, it held a hearing at which the "Court and counsel confer[red] extensively." The court's subsequent January 30, 2024 order, to which no objections or requests for clarification were filed, gives no indication that the valuation date was part of those discussions. The first indication that the valuation date was contested was Jay's motion to reopen evidence, filed months after trial while preparation of the final judgment was pending. The party seeking to reopen evidence must provide a satisfactory explanation for the failure to present the additional evidence in a diligent manner (see *Broden v. Marin Humane Society* (1999) 70 Cal.App.4th 1212, 1222), and the "[d]enial of such a motion is ordinarily reviewed for abuse of discretion." (*In re Marriage of Honer* (2015) 236 Cal.App.4th 687, 699.) Jay provided no explanation for the delay in bringing the matter to the court's attention. He also has not argued, nor does the record support the conclusion, that the court abused its discretion in denying the belated request to reopen evidence.

## III. *Watts* Charges

### A. Legal Principles

"*Watts* charges are used to compensate the community when one spouse has the exclusive use of a community asset, most often the couple's residence, between separation and trial." (*Mohler*, *supra*, 47 Cal.App.5th at p. 796.) "The spouse using the property is charged "'for the reasonable value of that use.'"" (*Id.* at p. 796-797.) Typically, *Watts* charges are calculated by first determining the amount of "overall profit from rental that would have obtained" during the period in which one spouse occupied the property. (*Id.* at p. 798.) That "profit" is the "amount by

20

which the rental value exceeded the expenses to maintain and operate the property" (*id.* at p. 795), and may be calculated "by subtracting from the expected monthly rent the amount necessary for expenses, including mortgage, taxes, homeowners insurance, maintenance, and repair." (*Id.* at p. 798.) In the next step, the court multiplies the resultant amount by the community's beneficial share of the property; that is the amount the community charges the spouse for his or her use of the property between separation and trial. (*Ibid.*) This formula is "the basic approach for the trial court," which may consider other factors pertinent to the case before it. (*Id.* at p. 798, fn. 5.) Ultimately, the court "has discretion, based on equitable considerations, as to whether to impose *Watts* charges and in what amount." (*Id.* at p. 797.) Any assessed *Watts* charges are "paid to *the community*." (*In re Marriage of Jeffries* (1991) 228 Cal.App.3d 548, 553.)

### B. Analysis

Jay contends the court erred in assessing him $385,000 in *Watts* charges, and by ordering him to pay them directly to Sara. He asserts that, "based on *Mohler*," he "should owe the community (as opposed to Sara)," the community's share of the $385,000 fair market value of the rent, or $242,550 (0.63 x $385,000).[6] Sara responds that the trial court properly calculated the charges and "properly used its discretion in awarding Sara, not the community."

It appears from the record that the court may have erred in several respects when assessing the *Watts* charges in this case.

---

[6] Jay alternatively contends the community's share should be "58.34 percent" of the $385,000, a proportion derived by using the higher acquisition value we previously have rejected.

First, although it recognized that *Mohler* "instructs that the court is to determine the overall profit from rental that 'would have obtained' during the Respondent's occupancy of the property," the court simply assessed the full amount of the fair market rent, $385,000, without any apparent consideration of or reduction for the expenses Sara incurred to maintain the property. To be fair, it is not clear whether the parties introduced evidence of those expenses during trial, though the record contains a 2021 declaration from Sara asserting that the "mortgage, property taxes, and homeowner insurance" were $7,243.66 per month. Notably, Jay's proposed calculation suffers from the same infirmity.

Second, the court stated that the *Watts* charges were "not affected in any way by the *Moore/Marsden* calculation." That comment may reflect a misunderstanding of the basic *Watts* formula as set forth in *Mohler*, which expressly provides that the net profit should be multiplied by the community's beneficial interest in the property. The community's beneficial interest is determined during the *Moore/Marsden* calculation; *Moore/Marsden* accordingly affects the *Watts* charges at their foundation.

Third, the court ordered Jay to pay the *Watts* charges directly to Sara rather than to the community. *Watts* charges are by definition paid to the community. (See *Watts*, *supra*, 171 Cal.App.3d at p. 374 ["the trial court will determine whether John should be required to reimburse the community for the value of his use of community assets after the date of separation"].)

We recognize, of course, that the trial court has the discretion whether to assess *Watts* charges, and in what amount.

22

We further recognize that many equitable considerations to which we are not privy may have informed the court's ruling here. However, "[w]hile the abuse of discretion standard gives the trial court substantial latitude, '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of the action. . . ."'" (*Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 119.) "'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.'" (*Ibid.*)

Here, as in *Mohler*, *supra*, 47 Cal.App.5th 788, we conclude that the appropriate course of action is to remand the matter to permit the parties to present relevant evidence and the court to use the basic formula articulated above as a starting point in its analysis and assessment of *Watts* charges payable to the community. We in no way "constrain the trial court's proper discretion in equitably applying *Watts* charges upon considering factors not articulated here." (*Id.* at p. 798, fn. 5.)

## DISPOSITION

The judgment is reversed in part. The matter is remanded for further proceedings regarding the *Watts* charges. The remainder of the judgment is affirmed. The parties are to bear their own costs of appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, ACTING P. J.

We concur:

MORI, J.                                                    TAMZARIAN, J.

23