[No. A070433. First Dist., Div. Two. Aug. 1, 1996.]

In re the Marriage of MARY ANN and STEVEN SHELDON BRANCO.
MARY ANN BRANCO, Respondent, v.
STEVEN SHELDON BRANCO, Appellant.

## COUNSEL

Robert C. Borris, Jr., for Appellant.

Diane M. Bessette for Respondent.

## OPINION

**KLINE, P. J.**—This appeal concerns the characterization upon dissolution of the parties' marriage of real property owned by respondent wife prior to the marriage and of loans secured by that property. Appellant husband contends the community acquired an interest in the appreciation of the property during marriage that was not acknowledged by the trial court and complains that the court improperly found loans secured by the property to be community obligations.

### STATEMENT OF THE CASE AND FACTS

The parties were married on August 6, 1977, and separated on September 28, 1990. Prior to the marriage, in 1970, respondent and her former husband had purchased real property at 26432 Taft Street in Hayward for $28,950, as joint tenants. The former husband quitclaimed the property to respondent as her separate property when they divorced in 1973. Near the end of 1976, the balance on the loan for this property was $23,482.91.

In June 1978, the parties refinanced through the Bank of America, using a portion of the $46,000 loan to pay off the original home loan. The loan application showed the balance on the original mortgage as $22,800. Respondent testified that the remainder of the new loan was used to pay outstanding bills each party carried from before the marriage and to buy a camper and a truck and testified that the debts paid off for each of the parties were "pretty close" to equal. Appellant testified that the loan proceeds were also used to pay for a swimming pool, landscaping, new fences, a retaining wall, an installed barbecue and a vacation.[1] The parties' loan application used both parties' names and listed both of their earnings, the loan was secured by the home, and the promissory note and new deed of trust were signed by both parties. At the time the loan was taken out, the value of the home was approximately $57,500.

---

[1]Appellant testified that $15,000 of the loan proceeds were used for the pool while respondent testified the pool was paid for from a $17,000 payment she received from life insurance on her first husband. A death certificate submitted to the trial court for judicial notice after trial of this matter indicated respondent's former husband did not die until 1979.

In 1989, the parties jointly obtained a $60,000 loan from Great Western Bank, again secured by the home. In connection with obtaining this loan, respondent deeded the property to the community; appellant then deeded it back to respondent as her separate property. Although the two deeds were both dated June 7, 1989, they were notarized a day apart, the deed conveying the property to the community on June 8, 1989, and the deed conveying the property to respondent the day before, on June 7, 1989.[2] The deed to the community was recorded on June 15, 1989, and the deed to respondent was recorded on July 25, 1989. According to respondent's testimony, the lender had requested that appellant's name be added to the deed because the loan was a joint obligation. Also according to respondent's testimony, the loan proceeds were spent paying creditors, including child support arrearages for appellant's child from a former marriage, money owed for a car appellant had leased, and balances owed on credit cards in appellant's name alone, and purchasing carpeting, appliances and furniture for the home. Appellant additionally testified that some of the money was used to help respondent's daughter by another marriage, who had had an accident in another state. At the time of the 1989 loan, the bank appraised the home at $165,000. At the time of trial, the parties stipulated the value of the home to be $180,000.

Appellant testified that around the time the parties took out the loan from Bank of America in 1978, they entered into a written agreement that in the event the marriage did not work out, respondent would not ask for alimony or "touch" appellant's pension, and appellant would not "touch" respondent's house or its contents. Appellant testified that respondent kept possession of this agreement and he was not able to find it at the time of separation. Respondent denied the existence of such an agreement.

As of September 19, 1991, the balance on the Bank of America loan was $39,668.44; as of October 16, 1991, the balance on the Great Western loan was $56,343.80. Appellant made the mortgage, property tax and insurance payments during the marriage. Respondent made payments on the loans from the time of separation until March 1, 1991, for the Bank of America loan and until April 1, 1991, for the Great Western loan.

---

[2]Although appellant points out this anomaly in the dates of the deeds in reciting the facts of the case, he does not attach it any significance in the argument in his opening brief. In his reply brief, appellant asserts that at the time of the 1978 loan, appellant "never deeded back to" respondent. Appellant offers no citation to the record in support of this factual assertion, nor in support of his implicit assertion that respondent deeded the property to the community in connection with the 1978 loan. Accordingly, the conclusion appellant draws—that the property was at the time of trial and is at present held in joint tenancy (having been held in joint tenancy from the time of the 1978 deed until appellant deeded it to respondent on June 7, 1989, and again after respondent deeded it to the community on June 8, 1989)—will not be accorded weight here.

Trial of this matter was conducted on November 12, 1991, March 16, 1992, and September 10, 1992. After posttrial briefing of various issues, the court rendered a statement of decision on July 25, 1994, which was subsequently clarified on August 9, 1994. As relevant to this appeal, the court found that the home at 26432 Taft Street was respondent's separate property and that the loans taken with the home as security were community debts, the proceeds of the loans having been used to pay community debts and separate obligations of the parties. The court found that both parties benefitted from the loan proceeds and "[t]he fact that separate property of [respondent] was used to secure the loans does not change the reality that the loans are community obligations." The court found no authority for transmuting the community debts into assets, as appellant had urged, and found appellant secured no interest in the home by virtue of assuming and paying his equal share of the community obligations. The court found that the loan proceeds had been used to retire the preexisting mortgage on the home and to satisfy separate property obligations of appellant totalling over $16,000, that the parties had intended to begin their marriage free of preexisting encumbrances and that to the extent community property money was used to satisfy separate obligations of both parties, each had made a gift to the other. The court found that the parties had not agreed to make no claims against each other in the event of dissolution of the marriage. The parties were ordered to each pay one half of payments on the two loans.[3]

Judgment was entered on April 13, 1995. Appellant filed a notice of appeal on June 9, 1995.

## DISCUSSION

Appellant contends that the community property estate acquired an interest in the appreciation of the home during the marriage because a portion of the $46,000 Bank of America loan was used to pay off the original mortgage on the home. According to appellant, this portion of the new community property loan "stepped into the shoes" of respondent's prior separate property mortgage, helped to facilitate the "continued 'acquisition'

---

[3]The court assigned an additional loan taken to make capital improvements and repairs to the property as respondent's separate obligation; assigned one credit card obligation as appellant's separate debt; ordered other credit card debt incurred by the community and a 1985 tax obligation to be divided equally; found appellant had overpaid spousal support by $2,763.24 and was entitled to credit for this amount in the final determination of property equalization payments; and assigned ownership of the parties' vehicles, with an equalizing credit of $2,000 to appellant for the difference in values.

and purchase" of the home, and therefore should be treated as a community property economic asset.[4]

Appellant's argument is based on a line of cases considering the division of interests when community property is used to reduce the encumbrance on separate property. In *In re Marriage of Moore* (1980) 28 Cal.3d 366 [168 Cal.Rptr. 662, 618 P.2d 208], the wife purchased a house eight months before the marriage with a down payment and loan for the balance, took title in her name as a single woman, and made payments on the loan that slightly reduced its principal. During the marriage the parties made loan payments with community property funds. Upon dissolution, the community was given " 'a pro tanto community property interest in such property in the ratio that the payments on the purchase price with community funds bear to the payments made with separate funds.' " (*Id.* at p. 372.) Thus, in order to determine the separate property interest in the property, the court divided the separate property contributions (down payment and loan amount minus amount by which community property payments reduced principal balance of loan) by the purchase price of the property; to determine the community property interest, the court divided the amount by which community property payments reduced the principal by the purchase price. (*Id.* at pp. 373-374.) The community and separate property percentages were then multiplied by the total appreciation of the property during marriage to calculate the respective financial interests.

In *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426 [181 Cal.Rptr. 910], the husband purchased real property and had a home constructed some nine years before the marriage; after the marriage, the loan payments were made with community funds. Following *Moore*, *Marsden* calculated the separate property interest as the purchase price less the amount by which the community payments had reduced the principal of the loan, divided by the purchase price of the home; the community interest was calculated by dividing the amount by which community payments had reduced the loan principal by the purchase price. These percentages (75.98 percent separate property and 24.02 percent community property) were then multiplied by the appreciation of the property during the marriage. The husband's total separate property interest consisted of the down payment, loan payments made

---

[4]In his brief, appellant assumes that $26,000 of the 1978 loan was used to pay off the mortgage on the home, apparently deriving this number from respondent's testimony at trial, although appellant provides no citation to the record. There is evidence in the record that the loan balance near the end of 1976 (before the parties were married) was $23,482.91, and that at the time the 1978 loan was taken, the remaining balance on the home mortgage was $22,800. This court is not in a position to determine the precise portion of the proceeds from the new loan used to repay the preexisting one, but it is apparent that $26,000 is not the proper figure.

before the marriage and after separation, the appreciation of the property before the marriage, 75.98 percent of the appreciation of the property during the marriage, and half of 24.02 percent community share of the appreciation during the marriage. The wife's share of the community property interest was one-half of the sum of the amount of community payments reducing the loan principal plus the 24.02 percent community share of the appreciation during marriage.

In the present case, the parties did not, as in *Moore* and *Marsden*, make payments on the original mortgage with community property funds but rather paid off the original mortgage in full with proceeds from a community property loan. Although the trial court's conclusions that the parties intended to start their marriage with a "clean slate" and so used the loan proceeds to pay off separate debt of each party as well as for community purposes, to the benefit of both parties, are amply supported by the record, under the controlling authority of *Moore* the community is entitled to an interest in the property if it contributed toward the property's acquisition. Contrary to the trial court's conclusion that the "taking of the loans in no way facilitated the ownership or acquisition of the property," a portion of the loan proceeds were used to entirely pay the balance of the mortgage. We can discern no meaningful difference, for purposes of determining whether the community acquires an interest in real property, between the use of community funds to make payments on one spouse's preexisting loan and the use of proceeds from a community property loan to pay off the preexisting separate loan. The trial court's finding that the use of community money to satisfy a separate obligation was a gift from the other spouse, while doubtless the equitable approach, in this context appears to be inconsistent with the clear holding of *Moore*. (See *In re Marriage of Gowdy* (1986) 178 Cal.App.3d 1228, 1234 [224 Cal.Rptr. 400] [noting inconsistency between *Moore* rule and rule that use of community funds to improve separate property, with knowledge and consent of nonowner spouse, is gift to community not entitling community to reimbursement or interest in the property, and finding *Moore* controlling].)

We are aware that *In re Marriage of Stoner* (1983) 147 Cal.App.3d 858 [195 Cal.Rptr. 351] held that the community did not acquire an interest in a residence purchased by the wife, with a down payment made from separate property funds and a loan taken as a separate obligation but found by the trial court to be a community one, although community funds were used to make loan payments. *Stoner* determined that because the husband had executed a quitclaim deed to the wife at the time the home loan was obtained, he transmuted his community interest in the property and the use of community funds to repay the loan was a gift to the community. (*Id.*, at pp. 863-864.)

*Stoner* distinguished *Moore* by stating that *Moore* "concerned the proper method of calculating the interest obtained by the community as a result of payments made during marriage on an indebtedness secured by a deed of trust on a residence purchased by one of the parties *before* marriage." (*Id.*, at p. 863, italics in original.) Since *Stoner*, like *Moore*, was concerned with calculating the separate and community interests in one spouse's separate property residence, for which loan payments were made with community funds, we fail to perceive the significance of the property having been purchased during rather than before the marriage.

In our view, *Stoner* cannot be sufficiently reconciled with *Moore*. *Stoner* stated: "In the instant case, the trial court found the note secured by the first deed of trust to be the separate obligation of wife. The court also concluded that wife's separate property credit status became a community property credit status after the marriage and that the community property salary of $1,750 per month was used to secure the loan. The logical presumption arising, therefore, is that the loan, as originally secured, was community property in its character. Therefore, the community has a pro tanto interest in such property established by finding the ratio of payments on the purchase price made with community funds versus the payments made with separate funds. (*In re Marriage of Moore, supra*, 28 Cal.3d at p. 372.) *This presumption* was, of course, rebutted by the quitclaim deed executed by husband and the community obtained no interest. (*See* v. *See* (1966) 64 Cal.2d 778 . . . .)" (147 Cal.App.3d at p. 864, italics added.)

If the reference to "this presumption" in the last sentence quoted refers to the presumption that the loan was community property in character (the only presumption specifically mentioned in the paragraph), *Stoner* apparently concluded that the community acquired no interest in the property because, since the presumption that the loan was community property in character had been rebutted, the purchase price had been entirely paid with separate funds. While this conclusion would be unobjectionable, the opinion in *Stoner* does not explain how the further conclusion that payments on the loan with community funds were gifts to the community can be squared with *Moore*'s holding that such payments give the community a pro tanto interest.

If the reference to "this presumption" refers to the sentence immediately preceding it, *Stoner* appears to be saying that the community's acquisition of a pro tanto interest in the property had been "rebutted" by the husband's quitclaim deed. The *Moore* rule, however, is not a presumption that can be rebutted but a rule to be applied when community funds are used to acquire

a residence by reducing the principal owed on the loan by which the property was purchased. Thus, under either interpretation of this paragraph of the *Stoner* decision, we fail to see how its conclusion that the husband made a gift of community funds can stand in the face of *Moore*.[5]

Applied to the present case, the community property interest in the home would be computed by dividing the community's contribution to the purchase price of the home (payments reducing principal made with community funds on the original loan, if any, plus the principal balance of the loan paid off with proceeds of the Bank of America loan) by the purchase price. This percentage would then be multiplied by the appreciation of the home during the years of the marriage. Appellant would be entitled to one-half this amount as his share of the community interest. Respondent would be entitled to the other one-half of the community interest in the appreciation during marriage, as well as all the appreciation before the marriage and after separation, the down payment and payments reducing principal on the original loan made before the marriage.

Appellant additionally argues that the total responsibility for the Bank of America and Great Western loans should have been assigned to respondent because the property securing them was assigned to her. This argument is patently an attempt to "have his cake and eat it too." Except for the portion of the loan proceeds used to repay the original mortgage on the house, the loans were used for purposes having nothing to do with acquisition of the property. To assign liability for these debts to respondent would be to have her bear full responsibility for loans that benefitted the parties jointly and, in fact, served to discharge preexisting debts of appellant for which respondent had no responsibility. Indeed, the effect of the *Moore* rule in the present case is that appellant receives a major benefit from the community's use of funds to discharge respondent's preexisting debt while respondent assumes a liability without corresponding gain from the community's use of funds to discharge appellant's preexisting debt. The trial court correctly found the loans were community obligations to be shared equally between the parties.[6]

---

[5] *In re Marriage of Gowdy, supra,* 178 Cal.App.3d at page 1233, noted that *Stoner* attempted to distinguish *Moore* by stating that *Moore* involved community property payments on a residence purchased by one of the spouses *before* marriage—the issue in *Gowdy* and in the present case—and found *Moore* controlling.

[6] Appellant's argument that the loan obligations should have been assigned to respondent because antideficiency legislation (Code Civ. Proc., § 580b) protected her against personal liability poses a hypothetical situation so unlikely to arise (because the value of the home far exceeds the balances owing on the loans) that we do not give it serious consideration.

The judgment is reversed and the matter remanded to the trial court for proceedings to calculate the parties' respective interests in the real property.

Haerle, J., and Lambden, J., concurred.