[No. B184521. Second Dist., Div. Seven. Nov. 20, 2006.]

In re the Marriage of JANE HOLDER GERACI and JOHN J. GERACI.
JANE HOLDER GERACI, Respondent, v.
JOHN J. GERACI, Appellant.

**COUNSEL**

Knickerbocker Law Corporation and Richard L. Knickerbocker for Appellant.

No appearance for Respondent.

## Opinion

**JOHNSON, Acting P. J.**—The underlying action was for dissolution of marriage, characterization of property and division of community property assets and liabilities. Husband appeals, claiming the trial court erred in finding a general partnership existed between the husband and wife and thus all his postseparation earnings in this partnership constituted community property rather than his separate property earnings. Husband also claims the trial court erred in failing to grant his request for reimbursement of his separate property interest in the residence he had acquired more than a decade before their marriage. In addition, husband challenges the court's decision to award spousal support where the evidence showed the wife had substantial earning capability and was in any event then supported by her romantic partner. Finally, husband argues the court erred in sanctioning him by making him pay all community debts and by making him contribute toward the wife's attorney fees on the ground he had breached both his partnership and spousal fiduciary duties to his wife.

We conclude the evidence is insufficient to show the husband and wife actually formed a business partnership. Accordingly, we will reverse the portion of the judgment so finding, and by extension, the finding the husband's earnings generated postseparation were community property. We will also reverse the court's orders imposed as sanctions against the husband for having breached his fiduciary duties as a partner and remand to the court for reconsideration. Finally, we find the court's order for spousal support is not supported by adequate evidence or findings. Accordingly, we reverse the portion of the judgment ordering spousal support and remand for further consideration. On the other hand, we find the trial court correctly found the husband had failed to demonstrate a right to reimbursement of his separate property interest from the sale proceeds of the parties' residence. Accordingly, we affirm the judgment in part, reverse in part and remand with directions.

## FACTS AND PROCEEDINGS BELOW[1]

John J. Geraci and Jane Holder Geraci started living together in 1980. They lived in a house in Manhattan Beach John had acquired in a former marriage in 1973 for $43,000. In 1980 John razed the structure and built an entirely new 3,100-square-foot house in its place.[2] John and Jane married on June 18,

---

[1] This is an abbreviated summary of the facts presented at trial, addressing only the facts relevant to the particular issues raised in this appeal.

[2] As is customary in family law cases, we will refer to the parties by their given names for purposes of clarity and not out of disrespect. (See *In re Marriage of Nelson* (2006) 139

1983. They separated in October 2000 after a 17-year marriage. They had no children. In July 2001 Jane filed a petition for dissolution of marriage.

Jane worked for many years at South Bay Brokers as a commercial/residential property real estate sales agent, earning as much as $150,000 a year in commissions. She then took a corporate position at Standard Brands to handle their real estate matters. Her average salary was $75,000 a year. Jane worked at Standard Brands until the company was liquidated in bankruptcy in 1997. Jane then worked for a commercial real estate company for several months.

In the late 1990's Jane had a series of personal setbacks. Among other calamities, her marriage fell apart, her mother died in a car crash, and her best friend died of cancer. Jane became depressed and stopped working entirely.

After the parties separated in October 2000 Jane moved permanently to New Jersey to live with her deceased friend's husband and children. Jane did not work. However, in 2003 Jane acquired a New Jersey real estate license. By the time of trial in 2004 Jane had not yet taken a position with any real estate firm and had instead been working as a sometime retail sales clerk.

Jane often outearned John during their marriage. At the beginning of their relationship John wrote screenplays. He attempted to sell and market his screenplays through a business he called Manhattan Video. This business made money for a few years but was ultimately unsuccessful. John essentially abandoned Manhattan Video and it became defunct. John changed careers entirely and in 1995 he acquired a real estate agent license. He joined South Bay Realtors and began selling residential properties in and around the South Bay area. In the first few years he earned very little in commissions. However, the court found John had earned over $590,000, less commissions to South Bay Brokers, between January 2001 and September 2004, i.e., after separation and through the trial.

The income and expense declarations John filed in the dissolution proceeding did not reflect his true earnings postseparation in 2000. He did not file an amended income and expense declaration until near the end of the trial after Jane's counsel presented John with subpoenaed documents from South Bay Brokers showing the actual commissions John had earned for the years 2001 through the first eight months of 2004.

Cal.App.4th 1546, 1549, fn. 1 [44 Cal.Rptr.3d 52]; *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1 [30 Cal.Rptr.2d 306].)

In 1999 John's certified public accountant (CPA) advised him to create a business entity through which to pass his commissions so he could also deduct business expenses related to his real estate sales endeavors. According to John, his CPA recommended a partnership as the best business entity to form to pass through commission income. In 1999 John filled out a fictitious business name statement application stating he would be doing business as Manhattan Associates. When filling out the form John indicated Manhattan Associates was a general partnership. On the form John listed Jane as his partner. There was no evidence to show John filed a revised fictitious business name registration after he and Jane separated in 2000 stating he was now instead operating as a sole proprietor. Five years later in 2004, when it was time to renew his fictitious name registration, John made no revisions. He refiled the form indicating Manhattan Associates was still a general partnership with Jane.

Jane first learned of the partnership at trial.

By contrast, John treated Manhattan Associates as if it were a limited partnership when filing his federal income tax returns. On partnership schedules John indicated Jane was a .01 percent partner in Manhattan Associates. After separation he listed his mother as the .01 percent limited partner. After his mother died in 2002 John listed his CPA as being the .01 percent partner.

During their marriage John and Jane routinely lived beyond their means. They incurred between $2,500 and $4,000 per month in credit card debt. They borrowed money from a friend, from Jane's father and against a pension plan originally set up through the now defunct Manhattan Video.

John and Jane regularly refinanced the Manhattan Beach house to pay off routine debts and to cover living expenses. Four months after they were married, in October 1983, John got a loan secured by the house for $149,500. In January 1985 John got another loan for $193,000. In 1989 John and Jane took out a $100,000 home equity loan in order to remodel the kitchen and bathrooms. In 1990 they again refinanced by taking out two loans totaling $600,000. In 1997 they filed for bankruptcy protection but managed to save the house. In April 2000 they took out another loan for $153,000 and used some of the proceeds to prepare the house for sale.

In October 2000 John and Jane separated and sold their residence in Manhattan Beach. The house sold for $974,000 and netted sale proceeds of $354,000. The parties split the proceeds with approximately $159,000 going to Jane and John retaining the balance of approximately $194,000.

At trial John presented expert testimony to the effect the Manhattan Beach house had a fair market value of approximately $400,000 in 1983 when John and Jane married. John presented his own mortgage/market research analysis and testimony to the same effect. John claimed he was entitled to reimbursement of this separate property interest in the house from its sales proceeds.

The matter was tried over numerous court days spanning several months in 2004. At its conclusion the court issued a proposed statement of decision to which both Jane and John objected. After receiving input from both sides in the form of objections and proposed decisions, the court ultimately issued a revised judgment and statement of decision. As relevant to the particular issues raised in this appeal, the court ruled: (1) Jane was entitled to permanent spousal support of $3,500 per month based on the lengthy marriage, the fact they lived beyond their means during the marriage and her current financial need despite her earning ability during marriage; (2) Manhattan Associates is a general partnership between John and Jane and all partnership profits were and are community property; (3) John failed to establish his separate property reimbursement claim and thus the court would enforce the parties' pretrial division of the sales proceeds from the Manhattan Beach house; (4) John had breached his fiduciary duties to Jane by misrepresenting his postseparation income and by failing to disclose to Jane her interest as a general partner in Manhattan Associates and failing to share with her its profits; and (5) as a sanction for violating his fiduciary duties John was to pay all community debts as found by the court, as well as be required to contribute toward Jane's attorney fees and costs whenever the court ruled on this reserved issue.

John appeals from the adverse judgment.

## DISCUSSION

### I. *JOHN HAS FAILED TO ESTABLISH DIVISION OF THE SALES PROCEEDS FROM THE MANHATTAN BEACH RESIDENCE WAS ERRONEOUS.*

At trial John produced evidence tending to show the Manhattan Beach house had a fair market value of approximately $400,000 when he and Jane married. Based on this evidence John claims he was entitled to all of the $354,000 net proceeds from the sale of the house as reimbursement of his separate property interest. He claims the trial court erred in failing to grant his request for reimbursement of this separate property contribution to the residence.

"Where, as here, the trial court is vested with discretionary powers, we review its ruling for an abuse of discretion. (*In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1435 [28 Cal.Rptr.2d 726].) As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480 [274 Cal.Rptr. 911].) . . ."[3]

Family Code section 2640 authorizes reimbursement of separate property contrbutions in the division of property.[4] This section provides: "(a) 'Contributions to the acquisition of property,' as used in this section, include downpayments, payments for improvements, and payments that reduce the principal of a loan used to finance the purchase or improvement of the property but do not include payments of interest on the loan or payments made for maintenance, insurance, or taxation of the property.

"(b) In the division of the community estate under this division, unless a party has made a written waiver of the right to reimbursement or has signed a writing that has the effect of a waiver, the party shall be reimbursed for the party's contributions to the acquisition of property of the community property estate to the extent the party traces the contributions to a separate property source. The amount reimbursed shall be without interest or adjustment for change in monetary values and may not exceed the net value of the property at the time of the division."

■ Separate property contributions are reimbursed before dividing the remaining community property. "Under section 2640, the separate property contribution is reimbursed *prior* to the division of community property. (*In re Marriage of Witt* (1987) 197 Cal.App.3d 103, 105, 108–109 [242 Cal.Rptr. 646]; *In re Marriage of Tallman* (1994) 22 Cal.App.4th 1697, 1698–1700 [28 Cal.Rptr.2d 323]; Hogoboom & King, Cal. Practice Guide: Family Law 2 (The Rutter Group 1997) ¶ 8:466, p. 8-118.1 ['A reimbursement award comes off the top of the community property item in question before the [community property] interest in that property is divided.' (Italics omitted.)].) If there is insufficient equity at the time of dissolution in the property to which the contribution was made to fully reimburse the contribution, the entire asset is awarded to the contributing spouse. (*In re Marriage of Witt, supra*, 197 Cal.App.3d at pp. 105, 108–109.)"[5]

---

[3] *In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 625 [108 Cal.Rptr.2d 833].

[4] All further statutory references are to the Family Code unless otherwise indicated.

[5] *In re Marriage of Walrath* (1998) 17 Cal.4th 907, 913 [72 Cal.Rptr.2d 856, 952 P.2d 1124].

■ Of course, reimbursement only becomes an issue once a separate property asset takes on the character of community property. There are several ways in which this can occur. "When community property is used to reduce the principal balance of a mortgage on one spouse's separate property, the community acquires a pro tanto interest in the property. (*In re Marriage of Moore* (1980) 28 Cal.3d 366, 371–372 [168 Cal.Rptr. 662, 618 P.2d 208]; *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436–440 [181 Cal.Rptr. 910].) This well-established principle is known as 'the *Moore/Marsden* rule.' (See generally Hogoboom & King, Cal. Practice Guide: Family Law 2 (The Rutter Group 2002) ¶¶ 8:295 to 8:312, pp. 8-75 to 8-83; 1 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2002) Division of Specific Property, § 21.03, pp. 21-11 to 21-18.) The *Moore/Marsden* rule has been extended to cases involving separate commercial property. (*In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1007–1008 [226 Cal.Rptr. 766].) It has also been applied where the parties refinanced a separate residential mortgage during marriage. (*In re Marriage of Branco* (1996) 47 Cal.App.4th 1621, 1625–1629 [55 Cal.Rptr.2d 493].)"[6]

In the present case the evidence is undisputed John acquired the Manhattan Beach residence as his separate property in 1973 for $43,000. According to John, he had an outstanding mortgage balance of some $17,000 10 years later when he married Jane in 1983. The evidence was also undisputed in 1980 (three years before their marriage) John razed the structure and built an entirely new residence in its place. The parties married in June 1983 and in October 1983 they refinanced the house and took out a loan for $149,500. The evidence also established John and Jane refinanced the house, or took out home equity loans against the house, five more times during the course of their marriage.

Missing, however, is any evidence of how the rebuilding project in 1980 was financed and any evidence of John's *equity* in the property at the time of marriage. Did John pay cash for the reconstruction from his own funds premarriage? If so, he would have been entitled to reimbursement under section 2640 for these improvements as well. Did John secure a construction loan for the rebuilding project? If so, when was the loan repaid and with whose funds? Was the loan taken out in October 1983 used to retire a possible construction loan and/or John's original mortgage? If so, the community acquired a pro tanto interest in the property from the very beginning.[7]

---

[6] *Bono v. Clark* (2002) 103 Cal.App.4th 1409, 1421–1422 [128 Cal.Rptr.2d 31].

[7] The parties did not dispute loans made during the marriage were community obligations, to be shared equally between the parties, thus giving the community a pro tanto interest in the property. (See *In re Marriage of Moore* (1980) 28 Cal.3d 366, 371–372 [168 Cal.Rptr. 662, 618 P.2d 208]; *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 436–440 [181 Cal.Rptr. 910]; see also *In re Marriage of Walrath, supra,* 17 Cal.4th 907, 923 [the liability of

Despite all the evidence presented concerning the community's later refinancings and loan commitments there was an absence of evidence concerning the crucial issue of John's actual contributions of separate property to acquire and improve the residence in Manhattan Beach, and thus by extension, an absence of evidence of his actual equity interest in the property at the time of marriage.[8] John's evidence of the house's fair market value around the time of their marriage was thus largely immaterial. What was crucial was evidence of his actual equity in the house at the time.[9] If there were outstanding loan commitments (as was possibly the case given John's history of borrowing against the property) then these amounts had to be considered in assessing John's actual separate property interest.

Because of this crucial evidentiary gap the trial court found John had failed to carry his burden of identifying his separate property contributions to the property. Faced with this absence of evidence, the court decided to exercise its equitable, discretionary powers to enforce the parties' own pretrial settlement regarding the division of the house's sales proceeds as the best evidence of each side's respective interest. Under the parties' de facto agreement John received $194,000 and approximately $35,000 more than Jane. This amount, in the court's view, adequately accounted for John's separate property contribution toward acquisition of the Manhattan Beach residence based on the available evidence.[10]

community property includes debts incurred for the benefit of the community]; *In re Marriage of Branco* (1996) 47 Cal.App.4th 1621, 1629 [55 Cal.Rptr.2d 493] [community property estate acquired an interest in the appreciation of the home because a portion of a community property loan was used to pay off the separate property purchase money loan for the house].)

[8] At trial Jane argued the residence was transmuted in its entirety into community property when the parties transferred the Manhattan Beach residence into their revocable family trust in 1989. This argument was not well taken. First, the trust instrument expressly declares all separate property transferred into the trust retains its separate property character. Second, the trust instrument does not expressly declare it is changing the character of the Manhattan Beach residence from separate property into community property, or like words. Without such an express declaration of change in ownership or character a transmutation does not occur. (See *Estate of MacDonald* (1990) 51 Cal.3d 262, 264, 272 [272 Cal.Rptr. 153, 794 P.2d 911] [a writing signed by the adversely affected spouse is not an express declaration for purposes of transmuting property unless the writing contains language which expressly states that the characterization or ownership of the property is being changed]; *In re Marriage of Starkman* (2005) 129 Cal.App.4th 659, 664 [28 Cal.Rptr.3d 639] [transfer of separate property stock into a family trust did not transmute the property into community property because the writing did not unambiguously state it was making a change in character or ownership of the property].)

[9] *In re Marriage of Moore, supra*, 28 Cal.3d 366, 372 ("The value of real property is generally represented by the owners' equity in it . . . ."); *In re Marriage of Nelson, supra*, 139 Cal.App.4th 1546, 1557 ("Under *Moore*, the separate property percentage interest, like the community's percentage interest, is determined relative to the *original purchase price*.").

[10] From the court's ruling it can reasonably be inferred it was not persuaded by John's argument Jane had coerced him into dividing the sales proceeds with her by threatening to refuse to cooperate in closing escrow on the house. The reasonableness of this inference is

We find no abuse of the court's discretion in enforcing the parties' own pretrial agreement, similarly finding John failed to carry his burden of adequately tracing his separate property contributions.[11]

## II. THE EVIDENCE IS INSUFFICIENT TO SHOW MANHATTAN ASSOCIATES WAS A GENERAL PARTNERSHIP BETWEEN JOHN AND JANE.

The evidence showed John filed a fictitious business name statement application in 1999 stating Manhattan Associates was a general partnership with Jane and that he renewed this "dba" (doing business as) without change in 2004. The evidence also showed John filed partnership federal income tax returns for Manhattan Associates in which he apparently indicated the entity was instead a limited partnership, with the other partner holding only a .01 percent interest. Based on this evidence the court found Manhattan Associates was a community asset, and as the only other partner, that Jane was entitled to half the partnership profits under Corporations Code section 16401.[12] The court relied for its finding on the facts the partnership was never dissolved and Jane had not voluntarily or involuntarily agreed to dissolve the partnership or disassociate herself from the partnership. The court further found between January 1, 2001, to September 27, 2004, Manhattan Associates earned $590,601.83 in gross revenue (less commissions to South Bay Brokers) which John solely managed and controlled, and this amount constituted community property. The court's judgment says nothing about offsetting the business's gross profits by its expenses.

John contends the trial court prejudicially erred in finding Manhattan Associates was a general partnership with Jane and was thus a community asset. He argues Manhattan Associates was simply a dba registered for income tax purposes so he could deduct certain expenses, including health insurance costs for him and Jane. He points out Manhattan Associates has no other business, it has no employees and its only income is from his real estate commissions, all generated postseparation. He notes all Manhattan Associates income and profit was the result of his own efforts and personal services without any assistance from Jane.

---

strengthened by the evidence John did not request reimbursement for his separate property contributions to the house until years after it had sold and its sales proceeds divided.

[11] *In re Marriage of Duncan, supra,* 90 Cal.App.4th 617, 625.

[12] Corporations Code section 16401 concerns partner accounts, share of profits, reimbursements, conduct of partnership business and becoming a partner. Among other things, Corporations Code section 16401 specifies, "[e]ach partner is entitled to an equal share of the partnership profits and, . . . is chargeable with a share of the partnership losses in proportion to the partner's share of the profits." (Corp. Code, § 16401, subd. (b).)

Relying on section 771, John asserts all his earnings and accumulations while living separate and apart should have been declared his separate property.[13] Alternatively, John argues, assuming Manhattan Associates could be considered a community property business, its earnings postseparation were solely the result of his personal services and efforts and hence belong to him as the spouse who generated the income postseparation.[14] Finally, John argues because there was never any type of agreement between him and Jane to form a partnership, Manhattan Associates is not a general partnership and the court erred in so finding. We find John's arguments have merit.

 "When a spouse operates a community property business after separation, there is an inherent tension between the general rule that the business must be valued as of the date of trial (former Civ. Code, § 4800, subd. (a), now Fam. Code, § 2552, subd. (a)) and the rule that a spouse's earnings after separation are his or her separate property. (Former Civ. Code, § 5118, now Fam. Code, § 771, subd. (a); see *In re Marriage of Green* (1989) 213 Cal.App.3d 14, 20 [261 Cal.Rptr. 294].) Before 1976, the only method a court had to ameliorate the effects of a trial date valuation was to equitably apportion a spouse's postseparation efforts between community and separate interests. (*In re Marriage of Imperato* (1975) 45 Cal.App.3d 432, 436 [119 Cal.Rptr. 590].) However, in 1976, the Legislature amended former Civil Code section 4800, subdivision (a) (now Fam. Code, § 2552) to provide: '[T]he court shall value the assets and liabilities as near as practicable to the time of trial, except that, upon 30 days' notice by the moving party to the other party, the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and prior to trial to accomplish an equal division of the community property and the quasi-community property of the parties in an equitable manner.' The amendment was designed to remedy certain inequities such as 'when the hard work and actions of one spouse *alone* and after separation . . . greatly increases the "community" estate which must then be divided with the other spouse.' (*In re Marriage of Barnert* (1978) 85 Cal.App.3d 413, 423 [149 Cal.Rptr. 616].) In this regard, Family Code section 2552, subdivision (b) gives the trial court considerable discretion to divide community property in order to assure an

---

[13] Section 771, subdivision (a) provides: "The earnings and accumulations of a spouse . . . , while living separate and apart from the other spouse, are the separate property of the spouse."

[14] Citing *In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321, 331 [16 Cal.Rptr.3d 505] (distribution from law firm was for the wife's postseparation work and was thus the wife's separate property earnings); *In re Marriage of Imperato* (1975) 45 Cal.App.3d 432, 440–441 [119 Cal.Rptr. 590] (when one spouse's efforts postseparation increases the value of a community property asset fairness may require disregarding the corporate entity in a dissolution action in order to fairly apportion the property to account for that spouse's efforts).

equitable settlement is reached. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 603 [153 Cal.Rptr. 423, 591 P.2d 911].)"[15]

■ The good cause exception to trial date valuation typically applies to professional practices as well as small personal service businesses which rely on the skill and reputation of the spouse who operates them. "Case law has established that good cause generally exists for a professional practice to be valued as of the date of separation. (*In re Marriage of Kilbourne* (1991) 232 Cal.App.3d 1518, 1524 [284 Cal.Rptr. 201] [valuation of law practice]; *In re Marriage of Green, supra,* 213 Cal.App.3d [14] at p. 20 [valuation of law practice].) This exception to trial date valuation applies because the value of such businesses, 'including goodwill, is primarily a reflection of the practitioner's services (accounts receivable and work in progress) and not capital assets such as desks, chairs, law books and computers. Because earnings and accumulations following separation are the spouse's separate property, it follows the community interest should be valued as of the date of separation—the cutoff date for the acquisition of community assets.' (*In re Marriage of Stevenson* (1993) 20 Cal.App.4th 250, 253–254 [24 Cal.Rptr.2d 411].)"[16]

Thus, even assuming Manhattan Associates was a community property business the record evidence would have supported a finding good cause existed to value the business as of the date of separation (assuming John supplied the requisite 30 days' notice to Jane).[17] There was no evidence Manhattan Associates had any "capital" assets to speak of beyond a fax machine and telephone line. The evidence was undisputed all income generated by Manhattan Associates was based on John's personal skill, efforts and industry in marketing and selling residences. Moreover, the profits identified by the court as having been earned by Manhattan Associates were indisputably earned postseparation. The parties separated in October 2000. The Manhattan Associates' income the court divided was earned between January 1, 2001, and September 27, 2004. Thus, the undisputed evidence was

---

[15] *In re Marriage of Duncan, supra,* 90 Cal.App.4th 617, 624–625.

[16] *In re Marriage of Duncan, supra,* 90 Cal.App.4th 617, 625 (community property investment company for which husband made investment decisions for 97 percent of the fund's assets was dependent for its success on the husband's skill and expertise and these facts demonstrated good cause for the exception to a trial date valuation); see also *In re Marriage of Nelson, supra,* 139 Cal.App.4th 1546, 1551 (trial court properly used separation date to value wife's small doll and floral business); *In re Marriage of Stevenson* (1993) 20 Cal.App.4th 250, 254 [24 Cal.Rptr.2d 411] (husband's general contracting business was so dependent on his personal skill and industry, as opposed to its capital assets, there was good cause to value his business as of the date of separation); *Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 746 [249 Cal.Rptr. 42] (husband's medical corporation was properly valued as of the date of separation because it was a one-person intensive practice, all income came from the husband's services rendered after separation, and the corporation's capital assets amounted to less than $10,000).

[17] Section 2552, subdivision (b).

sufficient to show good cause to employ a valuation date other than the presumptive date of trial valuation.

More importantly, however, the evidence does not show a partnership was ever formed. Jane testified she knew nothing about a partnership. She testified she learned for the first time at trial John had registered Manhattan Associates as a general partnership with her as a general partner on the dba form.

John could not secretly and by his own actions create a partnership with Jane. If filing a dba was sufficient to create a legally binding partnership, simply because the dba form does not require the signatures of all partners,[18] then what would prevent someone from filing a fictitious business name statement stating he or she had a partnership with Bill Gates hoping creditors would look to Microsoft or the Bill & Melinda Gates Foundation for payment?[19] This cannot be and is not the law.

██ Corporations Code section 16101, subdivision (9) defines a partnership as "an association of two or more persons *to carry on* as coowners *a business* for profit formed under Section 16202. . . ."[20] Corporations Code section 16202 discusses the formation of a partnership. Subdivision (a) of this section specifies "the association of two or more persons *to carry on* as coowners *a business* for profit forms a partnership, whether or not the persons intend to form a partnership."[21]

These statutes recognize persons may unintentionally create a partnership where their actions and behavior demonstrate an intent to engage in business together. On the other hand, the undisclosed or subjective intent of one person is legally insufficient to alone create a legally recognizable partnership. "The question of the existence of a partnership depends primarily upon the intention of the parties ascertained from the terms of the agreement and from the surrounding circumstances. [Citations.] Ordinarily the existence of a partnership is evidenced by the right of the respective parties to participate in the profits and losses and in the management of the business. [Citations.] In ascertaining the intention of the parties, where they have entered into a written agreement, such intention should be determined chiefly

---

[18] See *Business and Professions Code* section 17913 showing an example of the fictitious business name statement application form adopted by the Legislature for statewide use.

[19] Any person who registers a fictitious business name statement declaring as true any material matter he or she knows to be false would be guilty of a misdemeanor offense. (See Bus. & Prof. Code, § 17913, subd. (c).)

[20] Italics added.

[21] Italics added.

from the terms of the writing. [Citation.] While the question of whether a partnership exists is to be determined from the nature of the relation agreed upon rather than the name which the parties have given to it, some weight must be given to the language of the parties themselves. [Citations.] It is the intention as evidenced by the terms of the agreement, and not the subjective or undisclosed intention of the parties, that controls. As was said by this court in *Associated Piping etc. Co. v. Jones* [(1936)] 17 Cal.App.2d 107, 110 [61 P.2d 536], 'The parties did intend to create exactly the relationship as shown by the contract, but did not intend that relationship to be called that of partnership. However, their intention in this respect is immaterial [citation]; and if the contract by its terms establishes a partnership between the parties, even the expressed intent that it should not be so classed would be of no avail. *It is the intent to do the things which constitute a partnership that usually determines whether or not that relation exists between the parties.* [Citation.]' "[22]

In the present case Jane never manifested any intent to associate with John to carry on any type of business. In fact, Jane only learned of the alleged partnership during the trial. The evidence also showed Jane moved to New Jersey after separation and John carried on his real estate business by himself. There were thus no opportunities for third party creditors or anyone else to interpret her conduct as manifesting an intent to operate John's real estate business as a partnership.

■ In short, Manhattan Associates as a partnership never came into existence as there can be no such thing as a partnership with a person who has no knowledge of the business enterprise, does not manifest agreement to engage in a business enterprise with the other person, and who is physically and otherwise dissociated from the other person and his business endeavors.[23] Accordingly, we conclude the court's finding Manhattan Associates was a community property partnership whose profits should be divided as community property does not find support in law or the evidence and must be reversed.[24]

---

[22] *Constans v. Ross* (1951) 106 Cal.App.2d 381, 386–387 [235 P.2d 113], italics added; see also 9 Witkin, Summary of California Law (10th ed. 2005) Partnership, section 25, page 600 ("The intention of the parties to carry on as coowners a definite business is ultimately the test of partnership . . . [and such] intent may be implied from their acts.").

[23] *Billups v. Tiernan* (1970) 11 Cal.App.3d 372, 379 [90 Cal.Rptr. 246] (mere common ownership of property or common interest in a business does not of itself establish a partnership; the question of partnership is one of fact).

[24] John's acts in filing dba forms stating he was doing business as a general partnership with Jane, and in filing federal income tax returns stating he was instead doing business as a limited partnership, were ill advised, if not perjurious. While it appears these were John's erroneous and/or naive attempts to create a business entity against which he could deduct business expenses, it does not appear his efforts were designed to gain any advantage over Jane or to

### III. *THE COURT'S ORDERS IMPOSED AS SANCTIONS FOR HAVING BREACHED HIS FIDUCIARY DUTIES AS JANE'S PARTNER AND SPOUSE MUST BE RECONSIDERED IN LIGHT OF THE FACT NO PARTNERSHIP EXISTED.*

The court found John had breached his fiduciary duties to Jane as a spouse and partner and ordered him to pay a "disproportionate" share of the community debt as a sanction. The "disproportionate" share of the community debt included all the debt confirmed as community: (1) repayment of a $30,000 loan plus accrued interest borrowed from a family friend; (2) repayment of a $20,000 loan Jane's father made to the community to pay for John's daughter's wedding; (3) payment of tax, penalties and interest owed the Internal Revenue Service for tax years 1998 and 1999. In addition, the court ordered John to "contribute" to Jane's attorney fees and costs whenever the court ultimately ruled on this reserved issue.

The court ordered these sanctions based on its finding John had breached his fiduciary duties. The court's rationale in its entirety is as follows: "The finding of [John's] breach of his fiduciary [d]uties owed to [Jane] was based on the finding: that much of [John's] testimony about his income and the partnership paperwork regarding Manhattan Associates was not credible; and the finding that [John] breached his fiduciary duty as both a husband, under *Family Code* § 2102,[25] and partner and as a general partner under *Corporations Code* § 16404."[26]

The court's finding John's testimony was not credible when he explained the accounting method he used in his income and expense report for

damage her personally. Although it was hypothetically possible some creditor could have relied on the dba to assert Jane had some partnership liability, this did not occur. Had it occurred, Jane could have easily disclaimed any association with or even knowledge of the alleged partnership, as she did in this case.

[25] Among other things, section 2102 explains parties to a marital dissolution action have a fiduciary relationship until essentially the final resolution of all issues or distribution of all assets and liabilities. This fiduciary relationship creates the duty to provide "accurate and complete disclosure of all assets and liabilities in which the party has or may have an interest or obligation and all current earnings, accumulations, and expenses, including an immediate, full, and accurate update or augmentation to the extent there have been any material changes." (§ 2102, subd. (a)(1).)

[26] Corporations Code section 16404 lists the various fiduciary obligations a partner owes to the partnership and to other partners. One of the obligations of a partner is to "account to the partnership and hold as trustee for it any property, profit, or benefit derived by the partner in the conduct and winding up of the partnership business or derived from a use by the partner of partnership property or information, including the appropriation of a partnership opportunity." (Corp. Code, § 16404, subd. (b)(1).)

determining his postseparation commission income is amply supported by the evidence. His alleged accounting method defied logic and reason and (no doubt inadvertently) created internal inconsistencies in his testimony as well. When John's declared income was compared against the records South Bay Brokers created when paying John's actual commissions it was obvious John had understated his income in his income and expense reports filed with the court under penalty of perjury. Once confronted with South Bay Brokers' records, he filed an amended income and expense report to reflect his true commissions.

Failing to voluntarily and accurately declare his actual earnings was in fact a breach of the fiduciary duties he owed to Jane as a spouse. Based on the fact John falsely understated his postseparation earnings the court was warranted in imposing some type of punishment and/or sanction against John.[27]

However, the same cannot be said regarding John's alleged breach of his fiduciary duties as a partner and as a general partner. As found in the previous part, there was no evidence a partnership was ever formed between John and Jane. Because there was no partnership, John owed no fiduciary duties to Jane *as a partner* and therefore he could not breach his fiduciary duties to her *as a partner*.

However, when Jane produced evidence showing John had registered a fictitious business name statement declaring Manhattan Associates was a general partnership between John and Jane this evidence demonstrably and negatively affected the balance of the proceedings. Thereafter, Jane claimed John had deliberately concealed the Manhattan Associates community property asset. For this reason, Jane claimed she was entitled to the entirety of Manhattan Associates' gross profits, and not just her community property share.[28] Jane also asserted, among other arguments, she was entitled to the condominium in which John then resided, claiming it was purchased with funds generated by Manhattan Associates' profits. The court did not sanction John to the extent Jane requested. However, the court did sanction John based

---

[27] Section 2102; see also section 721, subdivision (b) (the confidential relationship of married persons imposes a "duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other").

[28] Citing *In re Marriage of Rossi* (2001) 90 Cal.App.4th 34 [108 Cal.Rptr.2d 270] (wife's fraud in concealing her lottery winnings during the marriage warranted an award of all the lottery winnings to the husband as a sanction).

on its finding John had failed to disclose the partnership and had failed to share partnership profits with Jane and had accordingly breached his fiduciary duties toward her as a partner and as a general partner.

Thus, to the extent the court decided to impose sanctions based on John's alleged breach of his fiduciary duties *as a partner*, the cause must be remanded to permit the trial court to reconsider the propriety and/or extent of the sanctions imposed.

## IV. *THE RECORD DOES NOT REFLECT THE COURT CONSIDERED ALL THE STATUTORY FACTORS BEFORE MAKING AN AWARD OF PERMANENT SPOUSAL SUPPORT.*

The court addressed spousal support in its written proposed statement of decision. The court stated: "The CFC § 4320 sections [*sic*] favor [Jane] and the court orders permanent spousal support in a long term moderately high life style marriage where the parties regularly lived beyond their means to [Jane] at the rate of thirty five hundred dollars per month ($3,500.00) beginning on January 1, 2005. The court orders [Jane's] counsel in preparing the judgment to put the *Gavron* [*In re Marriage of Gavron* (1988) 203 Cal.App.3d 705 [250 Cal.Rptr. 148]] warning in the judgment thereby going on record with that advice for [Jane]. The evidence demonstrated that although [Jane] is struggling now, she did out-earn [John] at times during the marriage. Due to the length of the marriage, the court declines to set a termination date at this time."

Jane's counsel drafted the judgment on reserved issues, which ultimately became the court's judgment. Regarding spousal support the judgment states: "The California Family Code § 4320 section elements and the evidence presented at trial, favor the granting of permanent spousal support to [Jane], and the court orders permanent spousal support to [Jane] at the rate of Thirty Five Hundred Dollars (3,500.00) per month, with the first payment beginning on January 1, 2005 to be paid by [John]. Due to the length of the marriage, the court declines to set a termination date for spousal support at this time.

"NOTICE: It is the goal of this state that each party must make reasonable good faith efforts to become self-supporting as provided for in Family Code section 4320. The failure to make reasonable good faith efforts may be one of the factors considered by the court as a basis for modifying or terminating support.

"This ruling was based on the following findings:

"1. The court's order for spousal support was based on the court's finding that the marriage at issue was a long term marriage;

"2. The parties had a moderately high life style marriage, where the parties regularly lived beyond their means;

"3. The evidence demonstrates that although [Jane] is struggling now financially, [Jane] did out-earn [John] at certain times during the marriage.

"The following Family Code § 4320 factors favor [Jane's] request for permanent spousal support: Family Code § 4320 (a)(1), (c), (d), (e), (f), (g), (j), and (k). . . ."

" ' "In making its spousal support order, the trial court possesses broad discretion so as to fairly exercise the weighing process contemplated by section 4320, with the goal of accomplishing substantial justice for the parties in the case before it." [Citation.] In balancing the applicable statutory factors, the trial court has discretion to determine the appropriate weight to accord to each. [Citation.] But the "court may not be arbitrary; it must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth in [the statute], especially, reasonable needs and their financial abilities." [Citation.] Furthermore, the court does not have discretion to ignore any relevant circumstance enumerated in the statute. To the contrary, the trial judge must both recognize and *apply* each applicable statutory factor in setting spousal support. [Citations.] Failure to do so is reversible error.' ([*In re Marriage of*] *Cheriton* [(2001)] 92 Cal.App.4th [269,] 304 [111 Cal.Rptr.2d 755].)"[29]

Other than the court's general assertion the factors listed in section 4320 favored an award of spousal support to Jane the record provides no insight into how the court weighed the statutory factors and thus how it exercised its discretion. The judgment merely lists various subdivisions of section 4320 and states they favor an award of spousal support to Jane. This assertion without analysis provides no insight into the court's reasoning, or the facts on which it relied, when it purportedly weighed each of the statutory factors, as it was required to do.

■ Moreover, the evidence presented in this case raises some question whether the court in fact weighed or even gave due consideration to the statutory factors. By way of example only, the court's judgment cites section

---

[29] *In re Marriage of Nelson, supra,* 139 Cal.App.4th 1546, 1559.

4320, subdivisions (a)(1) and (g), as supporting an award of spousal support to Jane. Section 4320, subdivision (a)(1), directs the court to consider "The marketable skills of the supported party; the job market for those skills; the time and expenses required for the supported party to acquire the appropriate education or training to develop those skills; and the possible need for retraining or education to acquire other, more marketable skills or employment." Section 4320, subdivision (g), raises the issue of "The ability of the supported party to engage in gainful employment without unduly interfering with the interests of dependent children in the custody of the party."

John and Jane have no children, dependent or otherwise. Thus, Jane could engage in gainful employment without risk of detriment to any dependent child. Moreover, the evidence showed Jane already had highly marketable skills as a real estate agent for both commercial and residential properties. She had enjoyed success in the real estate field for over 15 years. However, and for whatever reason, Jane had not secured her New Jersey real estate license until 2003, shortly before trial in 2004. Jane's own testimony tended to show the real estate market in New Jersey was potentially quite lucrative. Jane testified, she lived in an affluent area in New Jersey and the real estate market there was fairly active. Thus Jane's own evidence showed she had the ability and potential to again enjoy a successful real estate career in New Jersey if she chose to pursue one.

 The court's judgment also does not take into consideration the evidence Jane had been cohabiting since the parties separated in 2000, despite John's requests for findings on the issue.[30] Section 4323 states "there is a rebuttal presumption, affecting the burden of proof, of decreased need for spousal support if the supported party is cohabiting with a person of the opposite sex. . . ."[31] "Cohabitation may reduce the need for spousal support because 'sharing a household gives rise to economies of scale. [Citation.] Also, more importantly, the cohabitant's income may be available to the obligee spouse.' (*In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1159 [238 Cal.Rptr. 12].)"[32] "[T]he Legislature created the presumption . . . based on thinking that cohabitation . . . creates a change of circumstance so tied in with the payment of spousal support as to be significant enough by

---

[30] See section 4332 ("In a proceeding for dissolution of marriage or for legal separation of the parties, the court shall make specific factual findings with respect to the standard of living during the marriage, and, at the request of either party, the court shall make appropriate factual determinations with respect to other circumstances.").

[31] Section 4323, subdivision (a)(1).

[32] *In re Marriage of Bower* (2002) 96 Cal.App.4th 893, 899 [117 Cal.Rptr.2d 520].

itself to require a re-examination of whether such need for support continues in such a way that it still should be charged to the prior spouse."[33]

Generally evidence of cohabitation is invoked as a change of circumstance warranting a modification of an existing spousal support order. But we see no reason why it should not also be a relevant circumstance when setting an initial spousal support award. In this case there was ample evidence of cohabitation. At trial Jane testified her relationship with her boyfriend was romantic. In pretrial discovery she described her boyfriend as her fiancé. At trial, however, Jane testified she had no intention of marrying him. Jane's father, by contrast, testified he hoped they would soon marry. The evidence showed her boyfriend supplied Jane with housing, with a leased car and a credit card in her name for her use. Jane testified she was supposed to pay him back for all her expenditures, including the equivalent of $1,000 a month for rent, whenever she became financially able to do so. She testified she then owed her boyfriend more than $30,000 in back rent, credit card and other debt. According to Jane's evidence, she contributed to the household by providing domestic services.

The foregoing is substantial and material evidence Jane was cohabitating within the meaning of section 4323 and might have a lesser need for spousal support than the court awarded had it considered this circumstance. However, there is nothing in the record to indicate the court fairly considered Jane's cohabitation when determining the type and amount of spousal support to award her.

In short, the record provides inadequate grounds to accord the usual deference to the court's exercise of discretion in making the award of spousal support in this case.[34] We will thus reverse the award of spousal support and remand to the trial court with directions to reconsider the issue, and to make the required factual findings under section 4320 and as requested by the parties.

---

[33] *In re Marriage of Leib* (1978) 80 Cal.App.3d 629, 643 [145 Cal.Rptr. 763] (while cohabiting with a person of the opposite sex a supported spouse cannot give away his or her services where the result is to create a status of apparent continuing need and thus to overcome the presumption of decreased need); see also *In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1163 [238 Cal.Rptr. 12] (supported spouse could not accept gifts from her cohabitant in lieu of monetary reimbursements for household expenses and thus create a situation of apparent continuing need).

[34] "In exercising its discretion the trial court must follow established legal principles and base its findings on substantial evidence. [Citation.] If the trial court conforms to these requirements its order will be upheld whether or not the appellate court agrees with it or would make the same order if it were a trial court." (*In re Marriage of Shaughnessy* (2006) 139 Cal.App.4th 1225, 1235 [43 Cal.Rptr.3d 642], quoting *In re Marriage of Schmir* (2005) 134 Cal.App.4th 43, 47 [35 Cal.Rptr.3d 716].)

## DISPOSITION

The portion of the judgment affirming the division of the sales proceeds from the residence is affirmed. The portion of the judgment declaring Manhattan Associates a partnership between the parties and dividing its profits as community property is reversed. The portions of the judgment imposing sanctions on John and awarding spousal support to Jane are reversed and remanded to the trial court with directions to reconsider these issues consistent with the views expressed in this opinion. Costs on appeal are awarded to appellant.

Woods, J., and Zelon, J., concurred.

On November 21, 2006, the opinion was modified to read as printed above.